FILED - LN
September 2, 2022 4:06 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: __jlg__ / _____ SCANNED BY _____

## APPEAL TO DICISION REGARDING JAMES CLAYTONS MDR 504 HEARINIGS

1. HEARING SET TO DETERMINE IF SCHOOL DID NOT INFORCE THE 504 ACCOMIDATION PLAN.
2. AND WERE THE BEHAVIORS IN QUESTION DISCUSED AT HIS MANIFESTATION DETERMINATIONS MEETINGS A MANIFESTATION OF THE STUDENTS DISABILITYS

**THE HEARING OFFICER SELECTED BY FOWLERVILLE SCHOOL DISTRICT WAS Richard E. Kroopnick,** FORMERLY OF THRUN LAW FIRM.

**1:22-cv-814**
**Jane M. Beckering**
**United States District Judge**

**Representation for Fowlerville School District**
**Jennifer K. Starlin**, Attorney
Thrun Law Firm, P.C.
Phone 517.374.8834 - Fax 517.484.0081
jstarlin@thrunlaw.com – www.thrunlaw.com
P.O. Box 2575
East Lansing, MI 48826
For deliveries only:
2900 West Road, Suite 400
East Lansing, MI 48823

It is easy to see that there is a conflict of interest regarding the selection of the hearing officer by Fowlerville School District.

On top of that My exhibits and testimony of witnesses proved beyond a reasonable doubt, that, in fact:

1. The school did not enforce James 504 accommodations.
2. The school also failed to recognize that the behaviors in question that lead to his expulsion were manifestations of his disability's.
3. This failure on Fowlerville School District part resulted in the expulsion of James Clayton. James has been out of school since February 2022 and James remains out despite the fact that he would like to return to school.

   A. But the hearing officer **Richard E. Kroopnick** refused to rule in our favor despite the fact that the evidence was clearly in our favor.

   B. The evidence of the hearing paints a very clear picture regarding the matters of the 504 hearing.

   C. The attached documents also describe the schools' motivations behind the reason they expelled him and how they conspired together to do so.

   D. It is imperative that we be granted an unbiased and fair Judge to determine the proper and just outcome regarding this matter.

Justin Clayton  9-2-22  (248)444-2582
8598 Cass River Dr
Fowlerville MI 48836

Opening Statement Regarding James 504 hearing:

This is a very simple case regarding James' complex mental health issues that result in disrespectful behaviors and self-sabotaging actions on his part. It is very difficult to know how exactly to handle James at times when he is acting out. His behaviors can cause those around him and himself frustration aggravation and hopelessness at times. It is sad for me to watch him reck his life and disrupt the lives of others. I love James and care for him and always hope that he will begin to think more positive thoughts, feel more uplifting feelings, and behave like someone who loves and believes in themselves. At times we see James make progress and at times we feel as though things for James are going in reverse. However, all this work fighting for James has exposed some serious issues in the Fowlerville School District. Those who we thought were working for James' best interest we realize now, they were not. Although some work was done and some effort was made, not enough work was done and not all that could be done was done. However, I do realize that no one likes to be disrespected and at some point, most people say enough is enough. James knows how to push people's buttons and he pushes them a lot. However, I thought that we were in this together with the school, working towards what is best for James and all involved. However, the reality is they don't care what is best for James, the school demonstrates that all they care about is everybody else and their reputation. The school intentionally kept James from getting an IEP and gave him the 504 instead. Moreover, by doing this it made it easier for them to get James out of school which ultimately became the direction they wanted to take. Along the way, they disregarded the 504 accommodation plan and James' mental health disabilities. The school unjustly expelled James and they did not enforce the 504 accommodation plan in the process. The school also choose to ignore James' mental health records alleviating them from truly understanding James' mental health disabilities. Without understanding, James' mental health issues unqualified team members of James 504 made decisions regarding whether or not James' disabilities had a significant relationship to the behaviors that lead to his expulsion. We have heard from other members of the community that this type of treatment of children with disabilities similar to James is not uncommon in Fowlerville. We believe that it was Fowlerville school's hope that after James' expulsion that James may go to a different school district ridding them of the problem. However, we will prove that James' behavior that leads to his expulsion is a manifestation of James' disability and we will prove that the school did not implement James' accommodation plan on his last day in school. Finally, the school will be held accountable for the mistreatment and unjust expulsion of James Clayton a 12-year-old boy with complex mental health issues.

Final Argument for 504 hearing:

1. James had a right to have both instances when Bobbie Sue testified and when Jason Miller testified that they recall instances when they believed that James' behaviors were manifestations of his disability because as the guidance from the Michigan Board of education states that when there is a pattern of behaviors that have been established that lead to discipline an MDR must be held, Jason Miller Bobbie Sue and Tim Dowker were aware of the well-known pattern of James suffering from repeated and consistent discipline enforced by Fowlerville School District. His right to MDR hearings was denied in these instances. Ultimately Jason Miller documents James' patterns of consistent discipline by Fowlerville School District in his From the desk of Jason Miller. Although Jason sites that James had 74 suspensions for K-5th grads. However, Jason Miller also testified that James' disciplinary behaviors were actually three times as many as he wrote down in his From the desk of Jason Miller. This type of continued and consistent disciplinary action by the Fowlerville School District against James points to the pervasive symptoms of James' mental health disabilities. It is strong evidence that shows that the cause of most of these issues is James' mental health disabilities.

I looked up the laws on MDR meetings and it turns out the school must talk about all relevant information regarding the incident being discussed. And that did not happen instead Jason Miller decided to wave my rights to discuss the relevant information regarding James' disability. This case is a wrap.

The MDR team must consider all important information related to the student's misbehavior. This includes:

A. Information related to the incident.
B. Test and evaluation results
C. Information from the parents
D. Observations
E. The student's current 504 and 504 progress reports
F. Medical information related to James' disabilities
G. Other relevant information.

Important relevant Information regarding James' behavior that led to the last MDR was NOT discussed. Test and evaluation results were not reviewed. Jason Miller claimed the meeting was an hour, however, he could not even remember that Rob Dorner was on his laptop typing almost the whole time. The meeting was not an hour it was actually closer to 10 to 20 minutes. We were NOT given adequate time to share our perspectives, opinion, or concerns regarding James and his disabilities. Observations regarding James, especially in relation to the event that led to the MDR were NOT discussed. The student 504 and other progress reports were NOT reviewed. Bobbie Sue

Adams claims that she has some of James' mental health information, however, none of James' medical health information the Bobbie Sue Adams says she has and Jason Miller claimed he probably reviewed was seen or reviewed at the last MDR hearing. No other relevant information was shared other than the deep and thought-provoking opinion of Rob Dorner which is James makes bad choices.

The conclusion is the MDR was not conducted properly.

HOWEVER, IN ADDITION:

2. My name was signed on several MDR forms by a staff member of Natali Kreeger Elementary without my permission and this is unlawful.

3. The latest 504 was not signed by me. But it would not matter if it were because the box marked I agree with 504 is not marked, and the date of the 504 being used at the last MDR meeting is 9/15/2021 which is the first one not the second one.

4. One of the staff members of Kreeger marked the box in the last MDR meeting that says that I received procedural safeguards because I did not mark that box. This is actually a crime called falsification of a government document because there was a clear intent to deceive those who view the document to cause the viewer to believe that I marked the box when I did not.

5. I asked everyone who testified that attended the last MDR meeting if they gave me the procedural safeguards, they said they did not, in fact, they also said that they did not see anyone give me the procedural safeguards.

6. Jason Miller could not remember that Rob Dorner was on his laptop most of the time in the last MDR hearing for James. When I asked Jason Miller, the person directing the meeting if Rob Doner was supposed to be taking notes regarding the meeting, he said he did not tell him to. But when I asked Rob about the use of his laptop in the last MDR for James he said he was using his laptop to take notes regarding the MDR meeting. Bobbie Sue when testifying says she relied heavily on Rob Dorner's opinion to determine if James' behavior regarding the event in question was a manifestation of his disability. However, Rob said when testifying that he was taking notes of the meeting during the last MDR meeting. Rob was typing on his laptop next to me at the last meeting for almost the whole meeting and he was not engaged. The only thing I recall Rob saying was James makes bad choices. On top of this, in the last MDR meeting, as testified by Jason Miller, Jason decided to waved my right to discuss most of the relevant information needed to determine if the event in question was a manifestation of James' mental health disabilities. Which he does not have the right to do.

7. James' mental health disability connection to his behaviors seems to be unrecognized by the staff of Kreeger and the administration of Fowlerville School District. Although recognized by the Fowlerville School Board at the Expulsion Appeal Hearing they refused to admit the very clear relationship between James' disability and his behaviors. This is because they are intolerable to them regardless of whether or not they are related to his disability to them it is irrelevant. Jason Miller finds the connection to James disability to be irrelevant because of the frequency and severity of James' manifestations. To Jason Miller James' manifestations are intolerable despite the fact that most of his outbursts are directly connected to or have a substantial relationship to James' mental health disabilities. Jason Miller focuses on, and continually cited during his testimony the nasty and frequent bad behaviors James presents, while he intentionally neglects the reason for the behaviors. To Jason Miller it is irrelevant and his feeling that he neglects James' disability is reflected by the way the paperwork was done regarding the MDR meetings. The paperwork done for the MDR meetings is messy confusing haphazard and, in some areas, falsified. REVIEW MDR PAPERWORK. Although the law states you must discuss all relevant information regarding the MDR meetings Jason Miller testified that he took it upon himself to disregard the law and wave my right to go over all relevant information regarding the meeting.

8. Jason Miller claims that the frequency and severity of the offenses led to his referral for expulsion, however, when we look at James' disciplinary record we don't see any difference in the severity of the issues other than the vape which was never proven. James never told any staff including Bobbie Sue Adams that he had a vape at school. Bobbie Sue said when she asked James if he had a vape, he said yes. However, I do not read that she asked him if he had it at school. However, when he was asked about it at the expulsion hearing sitting right next to me he denied having a vape in school. James was receiving consistent discipline throughout his time at Kreeger. The truth is although those who testified will not admit it they were sick and tired of dealing with James and they wanted him out of school. However, they made several crucial mistakes although they did have a plan. First, the plan was to deny him an IEP so that the school would not be responsible for FAPA in regards to James' education once they did expel him. Secondly, in the second semester when they knew that they were going to expel him they decided to change the wording in his 504, which was their attempt to make it less accurate in regards to how describes how his disability actually affects James' major life activities. Thereby the new wording would make it easier for them to expel him because it no longer covered as many aspects of James' disability related to his behaviors. Jason Miller when testifying said that it covers his education and instruction time so it does not necessarily apply to his none instruction time. Jason also testified that it applies at certain times or at certain locations. Ridiculous, it applies to every staff member, everywhere on school grounds, and at all times while James is on school grounds. Many

of the witnesses that testified did not even know who was responsible for enforcing James 504. When did I ask Jason Miller and Bobbie Sue Adams how they keep track of all of the 504 and IEP information? They said they do not memorize it. They have to refer to it to determine what to do. But at this point, I would say they do not refer to it they just do what they want.

9. The stupid chart that shows that the 504 says that the school had some kind of log sheet that shows that they were enforcing James 504 accommodations. BS! Bobbie Sue Adams wrote but like all of her work, she does not sign it. Bobbie Sue Adams writes at the top of the chart Damerrow, Morehead/Colins, however, they did not create it she did.  However, the teacher that should have been written at the top is Mrs. Cox who was James' teacher for 95% of the fall semester and should have been responsible for most of the check marks.  Bobbie Sue must have missed that detail when she created for this hearing. As testified Damerrow left 2 weeks into the fall semester and Mrs. Cox took over.  Since she had James for the 95% of the fall semester which is the time that most of the check marks were made.  However, in addition to this mistake on Mrs. Adam's part, she also failed to show who is making the check marks per date.  This is a document that should be filled out by the teacher, not a document that should be created by Bobbie Sue Adams who during testimony said that she created it by having conversations with Mr. Morehead, however, she failed to mention that she also had random conversations with Mr. Collins, Mr. Damerrow or Mrs. Cox, or substitutes.  It is extremely peculiar how in James' second semester that it is possible to have one column per day when James had Mr. Morehead in the morning and Mr. Collins in the afternoon. Remember Jason Miller testified that in the second semester Jason Miller attempted something with James that in his 19-year career in education he had never done or seen when he pressed what he calls his "nuclear button" to start James "FRESH START". This is when James bounced back and forth between two teachers in the last semester. It seems that there should have been two columns per day if one were collecting information from his two primary teachers. It truly appears from Mr. Morehead and Bobbie Sues testimony that this is a confusing and inaccurate document at best. However, I believe the truth is that Mrs. Adams intentionally created a false document in a last-ditch effort to give the appearance that James' teachers were keeping a log of James' 504 accommodation daily when in reality they were not, and neither were she nor could she. Moreover, how come this accommodation log never came out at any of the MDR meetings to be reviewed or discussed as it is supposed to?

10. Although the Disciplinary Board Discipline Packet does not indicate the use of the accommodation plan at any point.  Neither do any of the whiteness letters indicate that the accommodation plan was used.  Neither do the minutes say that the accommodation plan was used.  Neither does the behavioral record indicate that the accommodation plan was used.  In addition, Jason Miller was not present and was not a

first-hand witness to the events of James' last day. When Rob was questioned in regards to the implementation of the accommodation plan he was wishy-washy and uncertain. However, he testified that became involved after the fact as he came on the seen Bobbie Sue was trying to deal with James by giving him ultimatums to comply with the school's rules. Bobbie Sue Adams during her testimony did not say that Rob was a witness or that he was involved in the situation that day with James. Bobbie Sue was the only one that could have implemented the accommodation because she was there when James was dropped off at the office. She claims the school's central office is a quiet place for James, but that is not true. Mr. Miller testified that James had a responsibility room, his office, Bobbie Sues office, and Robs Offices that he could use that are quiet places for James to calm down. Bobbie Sue attempts to claim that the school office with 2 secretaries answering phones people constantly coming and going the sound of typing and kids walking down the hallway outside the office is a quiet place. No, it is not a quiet place. In addition, a quiet place to calm down is to be used before addressing concerns not before or during the implementation of putting James in a quiet place to calm down. No quiet place was used or suggested for addressing behavioral concerns James presented on that day.

11. In addition, when we look at James' medical file in addition to his 504 plans it paints a very clear picture that the events of James' final day at Kreeger are a manifestation of his disability. Let's review the medical file and compare it to the events of James last day in school.

**Below is testimony that supports my claims.**

Mr. Morehead Testimony

```
What I'm saying is that he's not
17 required to be disciplined if the accommodation plan wasn't
18 followed. Were you aware of that?
19 A No.
20 Q Okay.

Q Okay. So it shows that the school basically had no medical
12 information on Student at all. The only thing they actually
13 had was they have this adjustment disorder, PTSD diagnosis
14 from Community Mental Health and that's it. And you never
15 saw any medical information or anything, did you?
16 A No, sir.

Q Okay. So you never saw an intervention plan; is that
25 correct?
1 A I had it. I chose not to go by it, not to use it.
```

Okay. However, there's another plan called a consequence
13 plan. Are you familiar with that plan?
14 **A I didn't read it. If -- if there was one in there, I didn't**
15 **read it.**
16 Q You never read the consequence plan?
17 **A No.**

2 Q The question is do you -- were you ever a part of
3 conversations or did you ever hear anyone tell you that he
4 was placed in a quiet room to calm down?
5 **A No. I think I read here it said that he was pacing. That's**
6 **the impression I got, that he -- he never calmed down before**
7 **he went out the door.**
8 Q Right. Nor was he given the opportunity to do so?
9 **A I -- all I can -- I wasn't there, but I can go by what I**
10 **asked about later and Ms. Adams said, "I don't know what**
11 **happened. I was going to give him the option to go back to**
12 **Mr. Morehead's or call home and it never came to that." So**
13 **I can't speak to it. I wasn't there.**

Q But you don't have any way to prove that it wasn't a
24 manifestation of his disability?
25 **A No. Just going by my gut.**

16 Q In the consequence plan which you chose not to follow, it
17 says -- it says that you're supposed to use escorts when he
18 leaves the room on P- -- what is it? -- all right, P-17 or,
19 no, P-18. I'm sorry. P-18. And you chose not to do that.
20 Do you think maybe if you had chose to use escorts when he
21 leaves the room that maybe that event wouldn't occurred?
22 **A Maybe.**
23 Q Maybe we would have had a different result on that day
24 possibly, would you agree?
25 **A Maybe, yup.**

Q Okay. Did he seem like he was in a good mood that morning?
4 **A No.**
5 Q Okay. And I think you mentioned earlier that you think that
6 maybe Student had been coming back from a suspension that
7 day?
8 **A He was.**

25 Q Okay. And then within the first 40 minutes he was, I think
1 you said, not in a good mood, acting different than normal?
2 **A Yes.**

20 Q Yup. What do you recall about the discussion at that

21 meeting about the link between the misconduct on this
22 occasion and Student's disability?
23 **A I remember people talking about the decision about right and**
24 **wrong. Did this -- would he be precluded from know -- from**
25 **thinking ahead of time about what's right and what's wrong**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME I July 22, 2022
Page 78
1 **in this situation, this scenario. And, you know, I chalk it**
2 **up to acting impulsively and that was not the conclusion we**
3 **came to. That he had time to de-escalate this actually and**
4 **didn't.**

Here he claims that in fact, he thought James was impulsive that day.  Sounds like
he went along with others.

4 Q -- invisible disability is basically Student looks fine, he
5 walks fine, he talks fine, he's intelligent, he looks like
6 he's got his everything together but the invisible
7 disability inside of his mind you can't see which is
8 manifesting these outbursts and these out of control things
9 caused by his PTSD, his --
10 **A Yeah.**

Q -- adjustment disorder, his emotional control disorder,
12 anxiety which are all mentioned in his medical files. Do
13 you -- as far as understanding all of that, you've mentioned
14 earlier you're not a medical professional, you can only
15 speak to how it affects him educationally. But don't you
16 also think that you need to know how it affects him
17 behaviorally as well? Because that's really what we're
18 dealing with.
19 **A Right; right. To the best of my ability I need to, yes.**
20 Q But you're not qualified to be that, are you?
21 **A Right.**

22 Q That's an issue. And you're in these MDR meetings having to
23 make these determinations and yet you're not qualified; is
24 that true?
25 **A I'm not qualified as a psychologist or anything like that,**

4 Q But yet his behavior is what's causing the expulsion?
5 **A Yes.**

10 Q My last question is you claim friendly uncle was working to
11 build trust and you were hoping that it would cause him to
12 respect you and follow your direction and thereby lead to
13 him becoming a better student. However, would you agree
14 looking back at this point, considering that he was
15 suspended for, like, over 20 days -- I don't even know how

16 many days it was, it was probably, like, 30 -- during the
17 short period that you had him, he was expelled probably 80
18 to 90 percent or suspen-- suspended 80 to 90 percent of
19 the time during the time that you had him.
20 **A Right.**

11 K.H.: You are a good teacher. A very good
12 teacher. But you are not educated properly for this.
13 Q Yeah, I don't -- and I'm not -- I'm trying to phrase these
14 in questions.
15 **A Uh-huh (affirmative).**

13 Q But do you recall what would have been discussed in terms of
14 what documents would have been reviewed, that type of thing,
15 what was reviewed in terms of Student's history?
16 **A I don't recall a lot that was reviewed. We read about the**
17 **incident. We read the report of what happened. We -- I**
18 **think the copy of the 504 was there. And then just we went**
19 **around the circle and people talked about Student. And I --**
20 Q If you don't recall, that's very fair.
21 **A Okay.**
22 Q But I specifically would like to know if you recall
23 anything, a discussion about PTSD?
24 **A No, I do not.**

**Tim Dowker Testimony**

Q No, I don't because you told me I didn't -- I haven't even
9 investigated. I don't know if that's a better school for
10 him or not. And if you can't recall the conversation, then
11 it's hard for me to discuss it. But you're claiming that
12 you have a social emotional learning room or is it just in
13 class that you're referring to when you're saying that?
14 **A We have a social emotional learning goal and it's something**
15 **that we work with all teachers to work with, for example,**
16 **trauma informed instruction. You'll notice a lot of our**
17 **especially lower elementary rooms now have calming corners**
18 **and those sorts of things. We're *just* gradually trying to**
19 **increase teachers' capacity to meet the needs of a wider**
20 **range of students.**

8 Q Okay. Do you think it's important to understand what and
9 how children's mental health disabilities affect them?
10 **A Oh, yes.**
11 Q Okay. Can you describe what Student's mental health issues
12 are and how they affect him?
13 **A No.**

1 Q Okay. What is the complete job description and duties of
2 your 504 coordinator position?
3 **A So as the 504 coordinator, my job is to make sure that we**
4 **have a compliant 504 process, that we have people in each**
5 **building who implement that process and that they follow the**
6 **process, you know, with fidelity.**
7 Q So part of your job is to make sure they follow the
8 accommodation plan; is that correct?
9 **A That's part of the process.**

What can you tell me about Student's 504 without referencing
19 documents?
20 **A I can tell you that he has one.**

16 Q So did you ever review his 504 kind of before the MDRs and
17 the expulsion?
18 **A Not before the MDRs and expulsion, no.**

**How is Tim able to make sure the 504 is implemented correctly**
**when he does not even view them?  Not doing his job as he**
**described above!**

7 Q However, earlier you mentioned that ultimately you're the
8 person who is responsible --
9 **A Correct.**
10 Q -- for whether or not these are followed.
11 **A Correct.**

Q Were you aware that concerning the last day Student was in
13 school when he would not put his hood down, that none of the
14 staff ever put Student in a quiet place so that he could
15 calm down before addressing concerns?
16 **A It doesn't sound like they had the opportunity to do so.**

They had opportunity's.

25 Q I understand that they could see them as separate. It just
1 seems like they should still collect the information on the
2 mental health issues, especially considering they're
3 invisible and you can't see them.
4 **A Are you asking about Ms. Adams?**
5 Q I'm asking about why -- she states here that "we usually
6 don't collect it." Is that your -- is that -- is that
7 direction coming from you?
8 **A No. We collect evidence on anything that seems to be**

9 pertinent to the cause of the 504 or the need for a research
10 team.

And indeed they did have the ability to collect it and I and
Matt L testified to the fact that Kreeger had the ability to
collect everything from DHHS and CMH Livingston county and they
choose not to.  In fact, in his 504 it mentions that the
diagnoses came from cmh that are listed in his 504.  That is
only possible if there were a signed medical waver release
signed by myself.

22 me -- let me ask this question first. You did review his
23 504 when they were going into the MDR meetings; is this
24 correct?
25 **A Not when they were going into the MDR meetings, no. When it**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME I July 22, 2022
Page 140
1 **went to the board level.**

Tim did not review James 504 until the expulsion.

7 Q So you did review the 504 after it headed to -- to the
8 expulsion hearing?
9 **A Correct.**
10 Q Okay. Okay. And did you in addition to that review the MDR
11 hearing or MDR hearings paperwork too or no?
12 **A When you filed a due process concern.**
13 Q That's when you reviewed the MDR hearing paperwork?
14 **A Yes.**

**Tim did not review MDR documents until I filed a due process.
This guy does not do his job.  Make sure 504s are implemented
correctly.  He can't do his job because he is not involved in
the creation or the implementation of any 504s.**

Is this standard practice
18 to have multiple plans contradicting other plans? Is
19 this -- is this normal?
20 **A Again, I don't know that I would agree with the idea that
21 they contradict. I think key words here might be "blatant
22 respect" or "refusal to comply." And like I said, I've
23 learned much about the 504 just today,** our deeper focus on
24 it.

**Here Tim admits his limited scope of knowledge regarding 504
even though he is the 504 coordinator for 2600 students at
Fowlerville school district.**

14 Q Okay. And I believe Mr. Morehead testified earlier today
15 that he didn't suggest or make that recommendation either.
16 Did you hear that?
17 **A Did I hear him say --**
18 Q Did you hear him say that he suggested to Student to go to a
19 quiet place to calm down --
20 **A No.**

24 Q Okay. Mr. Morehead testified earlier that he came to school
25 frustrated when I asked him. Do you recall that?

J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME I July 22, 2022
Page 155

1 **A Bee in his bonnet I think is what he said.**
2 Q What did he say?
3 **A A bee in his bonnet I believe is what he said, yes.**
4 Q Okay. Which -- okay. And in here it says, "Student shuts
5 down easily when frustrated." So I would say that that part
6 of this description applies, wouldn't you?
7 **A That he was frustrated?**
8 Q Yeah.
9 **A It sounds like he was frustrated, yes.**
10 Q Okay. So that -- that applies. And then when he was
11 clapping his hands and he wouldn't cooperate and Mr.
12 Morehead gave him instruction and he wouldn't follow it, it
13 seems like he became -- I think it says defiance or defiant.
14 Would you agree that he became defiant?
15 **A That's defiant, correct.**
16 Q Okay. All right. And then when he went to the office and
17 he called Bobbiesue "a fucking bitch" -- which was
18 inappropriate and I don't condone -- would you say he became
19 combative?
20 **A Yes.**
21 Q Okay. So we have frustrated, yes; defiance, yes; combative,
22 yes. To me it sounds like you're agreeing that basically
23 this description fits his behavior on that given day.
24 **A Fits components of his behavior, yes.**

5 Q Well, it doesn't have to fit every component for it to be a
6 manifestation. It has to substantially have a relationship
7 to. Would you agree that it has a substantial relationship
8 to?
9 **A To the full occurrence of events?**
10 Q Would you agree that the events that Student did that day
11 has a substantial relationship to what this says right here?
12 **A This relates to what happened that day, components of what**
13 **happened that day, yes.**

3 Q One question I have is you mentioned earlier the 504 is

4 basically govern -- governs his education. And would --
5 but -- but would you also say that it governs behaviors as
6 well?
7 **A That it governs behavior? It could be -- it could be a**
8 **result of behavior, absolutely.**
9 Q Right. Because when we're talking about manifestation of
10 his disability, it's not just in regards to how it's
11 affecting his education, but it's in regards to how it's
12 affecting his behavior as well. Would you agree with that?
13 **A I think what it says is major life activity and I would**
14 **assume behavior is a component of that.**

**Kassy Henderson Testimony**

13 Q Jason Miller I recall in particular talking to him in a
14 meeting and him mentioning to us that there isn't as much
15 funding as you might think for special education and he has
16 limited staff and resources to, you know, accommodate
17 Student's needs. Jason Miller -- do you recall Jason Miller
18 saying anything to that effect?
19 **A I do.**

4 Q Looking back after going through this whole experience and
5 where we're at today, do you feel like the school was
6 wanting to get him out of school because they were tired of
7 having to deal with his behaviors?
8 **A Absolutely**

6 Q I don't even think we need to go to it because we've already
7 visited it several times. But within the exhibits Ms.
8 Adams -- Ms. Adams was asked why they never requested
9 Student's extensive medical file. She claimed that they did
10 not or they didn't get it -- they don't get it for mental
11 health issues. Why do you think that they did not request
12 it when it comes to mental health issues?
13 **A I can't say as to why they didn't. I can say that we**
14 **offered it many times due to the fact that his behaviors**
15 **were so extreme at times. We felt like they needed to have**
16 **it so that they could have a clear understanding of his**
17 **invisible disability but they said that they don't keep**
18 **that. That that's not pertinent. That a 504 is geared**
19 **towards something different than that which I didn't**
20 **understand. I still don't understand.**

4 Q Yeah. What do you think of it?
5 **A So, I mean, I don't think that it matters what I think of**
6 **it. It's obvious that the lack of knowledge of a child's**

7 **mental health issues and diagnoses has led to an expulsion**
8 **that should have not ever happened.**

24 Q Okay. Good answer. Did you ever hear me say at any time in
25 any of the MDR hearings that I waive my right to anything?
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME I July 22, 2022
Page 184
1 **A Never.**

16 Q Did we discuss number three in the MDR hearing in regards to
17 his final day in school when he was suspended for not
18 putting his hood down, and then he was expelled because of
19 all this stuff? Did they give us a chance to review any
20 relevant information?
21 **A Not that I recall, no.**

16 Q Earlier when I was talking to Tim when he was testifying I
17 asked him about his comment to me in regards to the Howell
18 School District having more accommodations for children like
19 Student. Do you recall that?
20 **A I do.**

21 Q Also after that expulsion hearing, the same meeting with
22 Tim, Tim mentioned that Student could do online school. Do
23 you recall him mentioning online education as a option for
24 him since he was being expelled?
25 **A Tim?**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME I July 22, 2022
Page 192
1 Q Yes.

9 Q Now that you kind of understand and you've actually heard a
10 lot, probably learned more through this hearing as well
11 about Student's conditions and how they affect his major
12 life activities. Is it clear in your mind that his
13 behaviors that led to Student's expulsion are -- are
14 connected to his mental illnesses and disabilities?
15 **A 100 percent; absolutely.**

16 Q Do you think the school handled Student's mental health
17 issues correctly?
18 **A I do not.**
19 Q How did the school fail Student?
20 **A Number one, they didn't give him an IEP and he deserved it**
21 **and needed it. Number two, we've been trying for since you**
22 **got sole custody to get this child an IEP and get him**
23 **properly diagnosed, properly educated, and properly assisted**
24 **in an academic setting. Number three, they got to the point**

25 **where even I get where they just, they're done. They can't**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME I July 22, 2022
Page 195
1 **deal with it. It's too much. They got parents complaining,**
2 **they got kids complaining, they've got this child who's**
3 **disruptive. They don't want to deal with it because it's**
4 **not as simple as a autistic kid who's having a tantrum.**
5 **It's a kid who's quite frankly calling you horrific things.**
6 **So I think as far as I'm concerned, what I would like to see**
7 **happen and what I would like school districts to do is to**
8 **learn about PTSD, to learn about invisible disabilities, to**
9 **educate themselves so that they can properly educate**
10 **children like him because it's challenging at best.**

17 Q And do you know that by them using the word "may" they get
18 themselves out of having to do it?
19 **A I think they think they get themselves out of it. But I**
20 **think as a public school system, they are held by a law that**
21 **they have to accommodate children with disabilities. I**
22 **think that they think they can get out of it, but they**
23 **cannot.**

10 Q This is my last question in regards to this line. Don't you
11 think it would have been more appropriate for them to use
12 the word "will" with their accommodations that they're
13 providing just as they used it with us?
14 **A Sure.**

17 Q Okay. Did you think that the school should have been
18 dealing primarily with me regarding Student and his many
19 school related issues?
20 **A I did communicate that with them, yes.**

22 Q Do you think the school followed the accommodation plan
23 especially in regards to when he -- and when I say "he," I
24 mean Student -- was expelled?
25 **A I do not.**

Would you agree that when I read
23 that, "the student shuts down easily, gets frustrated" -- he
24 was already frustrated when he got to school -- "with having
25 to do things he doesn't want to do," was trying to, you
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME I July 22, 2022
Page 204
1 know, maybe protect his friend that's wearing a hat so he
2 puts his hood up and then he still put his hood down and was
3 trying to help his friend, it leads to defiant behavior
4 which we experience until he gets kind of to the office and

5 then he becomes combative which is exact- -- when he gets to
6 the office he becomes combative and starts swearing. It
7 says the student shuts down, he's frustrated, came to school
8 frustrated "with having to do things he does not want to do
9 leads to defiance and combative behavior." Does that
10 describe kind of the picture of what we see when we think of
11 Student not putting his head down -- or not putting his hood
12 down, not complying, going to the office and cussing?
13 **A It does and -- but it leaves out a lot. So what -- what's**
14 **not in here and what was talked about to be in both 504s is**
15 **the simple tasks that Student cannot handle. The simple**
16 **things like, "Student, you need to sit still." That simple**
17 **thing can become a huge issue. So the 504, even though we**
18 **had discussed that in depth with them, does not allude to**
19 **the many moons of Student or the protective nature of**
20 **Student or the peer pressure of Student or the anxiety of**
21 **Student. They don't allude to that. And I feel as though**
22 **because it's not in there and even though they said, "oh,**
23 **well, we know him. We know how he is," this document, both**
24 **of these documents, do not have pertinent information on**
25 **this child that shows how he is. Because they can't**

1 **understand how he is. He's just a disobedient punk to them.**

3 **A It is, but I also know he had bad anxiety that morning about**
4 **going because he had been suspended for vaping yet not found**
5 **with a vape and he felt like they were going to attack him**
6 **and he had a lot of apprehension in the morning. And I**
7 **tried to reassure him that it was going to be a different**
8 **day, it was going to be a good day and -- and it wasn't.**

11 Q I have a letter here, it's Exhibit P-21. It's from Thomas
12 Kabisch, D.O. written, sent to the schools. And it says,
13 "Student will need to have protein snacks during the day to
14 stabilize his blood sugar. This is to address his
15 disruptive behavior. I ask for your cooperation." Does
16 that sound like something that maybe should have been added
17 to a -- to a plan somewhere?
18 **A Yes; yes.**

3 Q And you also believe that the events that took place on the
4 last day of school were a manifestation of his disability
5 according to what the 504 specifies?
6 **A Absolutely. I think there's many manifestations of his**
7 **disabilities because he doesn't just have one and he has an**
8 **invisible disability which even I without reading books that**
9 **I have read and studying and trying to understand him, even**

10 **I didn't quite grip and sometimes still don't. So**
11 **absolutely.**
1 Q I just wanted to touch on, you know, when you were -- when I
2 was questioning you earlier, we kind of alluded to the fact
3 that the communication wasn't going through me. It was
4 primarily going through you. And this -- this communication
5 that was primarily going through you I think was because
6 you -- you had mentioned you had four kids go through the
7 school and none of them were like Student. They're more
8 like J.M.C. who they're all, like, so far from Student it's
9 like different species almost. But they have -- you had
10 already developed a close relationship with them. I think
11 Bobbiesue felt, honestly, just more comfortable dealing with
12 you than she did me to a large degree. I mean, would you
13 agree with that?
14 **A What I would say is that being a single mother of four**
15 **children and going through the school district as I have**
16 **navigated, I made it a priority to make relationships with**
17 **these people because it's in my children's best interest;**
18 **right? And so I would agree that they are probably very**
19 **comfortable with me. I really do care about Bobbiesue**
20 **Adams. I really do like her. I really do like Donna**
21 **Aldrich. I really, you know, Taunya, eh, she's okay. So,**
22 **yeah, I think that's true. I think that they felt like I**
23 **would communicate with you and I may have lapsed on that a**
24 **little bit, but it was my understanding that you were made**
25 **privy via phone call and so –**

1 Q Well, earlier when you were being cross-examined she
2 mentioned -- kind of putting you on the spot -- did you
3 share that information with me in regards to e-mails you
4 were getting from the school in regard to pertinent
5 information. Do you feel like it's your responsibility to
6 be the middle man to communicate to me what the school is
7 supposed to do or is doing?
8 **A No. It was my understanding that they were communicating**
9 **with you and maybe I should have asked. It's just -- I -- I**
10 **thought that you knew. I didn't even -- I don't even**
11 **remember, honest to God, talking about the consequence plan**
12 **with you, so I -- I'm a little frustrated about that.**

1 Q Right; right. So next question that I'm leading to is that
2 do you think that it's the school's responsibility to make
3 sure they're communicating with the legal guardian, the
4 legal custodian, the father of the child when you're not the
5 legal custodian, you're not the physical custodian, you're
6 not the legal guardian, you know, you're not the mother?

7 Don't you think it's the school job and not your job to
8 communicate with the person who can actually make the legal
9 decisions?
10 **A I would say yes it is the school's job to communicate with**
11 **you adequately concerning your child.**

**Rob Dorner Testemony**

7 Q So how do you determine that? Like, if it's not the
8 behavior, it's not the type of behavior, it's not -- how do
9 you determine if it's a manifestation?
10 **A Yup. Clinically it would be understanding the diagnoses,**
11 **the manifestations of those diagnoses and I guess legally it**
12 **would be all the considerations of the event. May I give an**
13 **example and see if it's helpful?**

**None of the team members understood James diagnosis when**
**questioned in regards to his diagnoses.**

7 Q Oh, ADHD. But impulsivity doesn't necessarily apply to PTSD
8 or anxiety or emotional disturbances or conduct disorder
9 which we know for him. So, I mean, it seems complicated to
10 me; is that true? To try and really decipher whether or not
11 it's a manifestation of a disability or not? I mean,
12 it's --
13 **A Complicated would depend on the person. So for me -- no, I**
14 **take that back. Complicated in its truest sense would be a**
15 **good definition. There are components to this that must all**
16 **be assessed to determine the manifestation. So, yes, I will**
17 **agree with you. It would be a complicated process. It**
18 **would require multiple steps.**

3 Q You got FERPA, you got IDEA, you got REED.
4 **A We're acronym happy.**
5 Q It's almost coded so that we don't understand what's going
6 on.
7 **A Yeah.**

**Rob agrees that it is intentionally confusing for parents to**
**understand.**

21 Q Did you -- you just mentioned, you know, the information you
22 brought forward. What information did you bring forward in
23 MDR meetings that would help them to make a decision?
24 **A I believe the question to me is, Rob -- or, "Mr. Dorner, do**
25 **you believe that this was a manifestation of Student's**

Page 259

1 **disability?" And I would say -- I don't recall exactly what**
2 **I said. "Case law says this," "the disability speaks to**
3 **this." And medically my knowledge of Student, his past**
4 **behaviors in similar circumstances is typically what I will**
5 **speak to in an MDR.**
6 Q Did you say that in the MDR? Because I don't recall it.
7 **A I -- I would always say why I believed. I would never say,**
8 **"yes, I believe it is," "no, I believe it's not." I would**
9 **always give quite a rationale for the way that I'm making**
10 **the determination in efforts to make it not mine. I would**
11 **much prefer to go by case law, research-based medical**
12 **evidence, data from past incidents similar to what occurred**
13 **at that time.**
14 Q I can only tell you what I recall you saying. And what I
15 recall you saying, briefly, was that Student makes bad
16 choices. And that's kind of been your go-to and that's what
17 I recall hearing in the meeting. As far as the other stuff
18 you mentioned, I don't -- I don't recall you going into case
19 law or any of that other stuff. Do you remember talking
20 about it? Because I don't.
21 **A I -- I -- I've been involved in dozens and dozens of**
22 **manifestation determination reviews. I would be very**
23 **surprised if there was ever an instance where I did not**
24 **speak to why I was making a decision. And "choices" I do**
25 **not believe would be my global, you know, determination of**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME I July 22, 2022

Page 260

1 **anything. I have a list of case laws through MDRs and I**
2 **have, you know, my notes on disabilities along with my**
3 **education and experience and then I will always go back to**
4 **behaviors from previous similar incidences.**
5 Q At least if you're given the opportunity to; right? If
6 you're given the opportunity to discuss that information?
7 **A Yeah, I don't --**
8 Q Because in Form O in P-10, it says on number two --
9 MR. KROOPNICK: Wait; wait; wait. You're going to
10 have to --
11 J.C.: Form O, P-10.
12 THE WITNESS: I'm sorry. I don't see any of the
13 letters.
14 K.H.: There's not.
15 MR. KROOPNICK: There's one with their exhibits,
16 one with the school district exhibits.
17 THE WITNESS: Okay. Okay.
18 MR. KROOPNICK: Yeah, these are -- okay. So these
19 should be --
20 THE WITNESS: So would I just go down to it?

21 MS. STARLIN: Yup. Yeah, the letters aren't on
22 the 10.
23 THE WITNESS: Is that 10?
24 MS. STARLIN: Yeah.
25 Q So on Form O if you follow along with me on number two it
Page 261
1 says, "Review and summarize relevant information in student
2 file. Number three it says, "Review and summarize relevant
3 information in student's Section 504." Number four says,
4 "Review and summarize relevant teacher observations and
5 (sic) the student." And it says under each one of those
6 that I waived my right so it does look like we did a lot
7 of discussing about any of the stuff that you mentioned.
8 **A I have not found the form. I apologize.**
9 Q Oh. It's P- --
10 **A Regardless, I do not know -- I do not run MDRs and I'm**
11 **really not too familiar with the paperwork. So the**
12 **questions I'm asked and I answer, what happens with those,**
13 **I'm not positive.**
14 Q You just testified, like, two minutes ago that you
15 participated in dozens of MDRs.
16 **A Correct.**
17 Q But you're not familiar with the documentation?
18 **A I do not do the documentation, correct.**
19 Q But you see it, don't you? Don't you review any of this
20 stuff or no?
21 **A Afterwards?**
22 Q At any time.
23 **A No.**
24 Q Okay.
25 **A Review whether they completed paperwork appropriately?**
Page 262
1 Q Did -- did you -- do you review any of the MDR paperwork
2 that's done in the meetings ever? You ever looked at any of
3 this stuff?
4 **A I do not.**
5 Q Okay. Well, here it says that, you know, we didn't talk
6 about it because parent waived his right and that's in
7 regards to information that you kind of said you would
8 always discuss. But I'm saying you didn't have the
9 opportunity to discuss it because it got waived basically is
10 what --
11 **A Did they ask me whether I believe that it was a**
12 **manifestation of Student's disability?**
13 Q They did ask you that.
14 **A Okay. So we did discuss that?**

15 Q Yes; yes. We discussed it. And you said it --
16 **A Okay. And I gave an answer?**
17 Q You did.
18 **A Okay.**
19 Q You said "no." But as far as all the other clarifying
20 information about case law and different things, I never
21 heard that. I never heard any of that in the MDR. And if
22 you're doing dozens of meetings, it's hard to remember if
23 you -- if you talked about it. In fact, the other thing I
24 recall you doing was typing. You were typing on your
25 laptop.

J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME I July 22, 2022
Page 263

1 **A I do. I have my notes of the MDR.**
2 Q Okay.
3 **A Yeah. Go ahead.**
4 Q So you were taking notes while we were in the MDR of the MDR
5 meeting, is that what you were doing when you were typing on
6 your laptop?
7 **A Absolutely.**
8 Q Okay. Well, what do the notes say that you talked about?
9 Do you recall?
10 **A I do not recall.**
11 Q Oh. I'd like to have the notes.
12 **A Okay.**

13 Q What's your understanding of the meetings? Who's supposed
14 to be -- who's supposed to be allowed to be included in the
15 team member meetings at MDR?
16 **A People with pertinent information. So in other words, you**
17 **could have his therapist come in who is not a team member.**
18 **So you could have an advocate come in. The school could**
19 **have a psychiatrist come in. Anybody with pertinent**
20 **information.**

**Here Rob says they could have had a psychiatrist come in and**
**they choose not to do that.**

5 Q When I reviewed Student's 504, did you know in the 504 --
6 and now that you've admitted you're not a team member,
7 although you were involved -- that it requests comprehensive
8 medical information?
9 **A Yes.**
10 Q Did you know that almost no medical information was
11 provided?
12 **A I did not know that.**
13 Q The only medical information that the school had to go off
14 of was diagnoses that they received over the phone from CMH

15 when they made a phone call in regards to Student, which in
16 itself proves that I signed a release of information with
17 CMH by the way. They decided not to collect any of that
18 information even though they had a release of information.
19 They could have collected it all if they wanted to. And you
20 weren't aware that they didn't have any of that medical
21 information; is that true?
22 **A That -- that would be correct.**

7 Q Anyway, they got these plans going and there's a whole bunch
8 of them. It just seems to me -- and you may agree with
9 this, and it seemed like Mr. Morehead did when I was talking
10 to him about it -- that they've got all these different
11 plans and sometimes it could be difficult for staff to
12 figure out which plan to use, you know. Because you got
13 issues you're dealing with and which plan are you going to
14 use in regards to this? And I could imagine that could
15 potentially be confusing. What's your feelings on that?
16 **A In general, having multiple plans could be confusing, yes.**

19 Q It says, "Student shuts down easily when frustrated with
20 having to do things that he doesn't want to do." This
21 "leads to defiance and combative behaviors." And to me that
22 sounds tremendously like the events that occurred the last
23 day of school when he wouldn't take his hood down. Now
24 what's your feelings about that?
25 **A That does seem to correlate.**

1 Q And if you say that correlates, then in essence I don't know
2 if you know what you just said because that means from my
3 perspective that the events that occurred that day were in
4 fact a manifestation of his disability according to what the
5 504 specifies as a manifestation. Do you understand that?
6 **A I do, yes.**

7 Q Okay. So you would agree that the events that occurred were
8 a manifestation of his disability on that particular day?
9 **A Yeah. Again, in the way that you worded that, absolutely.**

**What I -- go ahead.**
11 **J.C.: Where do we go from here? Would you like**
12 **me to continue my line of questioning? He just said that it**
13 **was a manifestation of his disability at the MDR hearing.**
14 MR. KROOPNICK: Continue your question.
15 J.C.: Okay.
MR. KROOPNICK: That was the question you asked.
17 You didn't ask about manifestation.

Look above Rick I did ask him about it being a manifestation, and he said yes!

22 Q Now, did Student ever use profanity with you?
23 A I let all my students know that that is their safe place
24 because I believe they need to release, so they are allowed
25 to use profanity. That being said, Student absolutely never

J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 317

1 used profanity towards me.
2 Q Okay.
3 A He might say, "I hate that f'ing b" about a specials
4 teacher, again, with permission. But he never, even on --
5 if that was March 1st, the day -- no, I think that was the
6 MDR. Anyway, the day that led to the expulsion, he cussed
7 out everybody except me and told me no, you know.
8 Q Uh-huh (affirmative).

Rob allows the use of profanity but when James uses it with other staff he gets expelled.  Confusing!

18 Q Okay. Now, if you look at the kind of fourth bigger box, it
19 says,
20 "Identify how this disability affects the major
21 life activity." "Student can become lethargic and/or
22 feel incapable of academic success due to negative
23 emotionality. His nervousness and irritability can
24 interfere with focus and attention to instruction,
25 tasks and assignments."

J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 337

1 Is that consistent with what you were seeing in
2 Student over the years with how his PTSD and adjustment
3 disorder manifest in the school setting?
4 A Definitely.
5 Q Okay. Do you have any examples of that and specific
6 incidents that come to mind?
7 A Oh, yes. Daily. I mean, Student will start to get goofy,
8 especially when given academic tasks. He tells his teacher
9 that he, you know, refuses to do things. And when a teacher
10 would let it go or tell him do silent reading, things would
11 go okay. If somebody raised their voice or asked him to do
12 something, he would argue, argue, and that did not always
13 lead to an office referral, but he would just kind of have
14 that negative emotionality. And the focus and attention,
15 again, teasing out apathy and, you know, how it relates to
16 his disability is difficult due to Student's extraordinary
17 apathy towards academics. But, yes. He would become --
18 "agitated" even sounds too strong, dysregulated when these

19 things happened.

**FINALLY, ROB DESCRIBES SOME OF THE BEHAVIORS THAT ARE ASSOSIATED WITH A MANIFESTATION OF HIS DISABILITY.  COME TO FIND OUT THESE ARE MANY OF THE BEHAVIOR MANIFESTATIONS THAT WE SAW FROM HIM ON HIS LAST DAY IN SCHOOL.  WOW!**

5 Q So looking at both Section 504 plans and recognizing that
6 the other one we just looked at was the one in place at the
7 time, but why did -- why do you believe that this was not a
8 manifestation of his disability when he has a previous 504
9 plan that says that when he has to do things he doesn't want
10 to do he engages in defiant behavior?
11 **A Yeah. Again, just evidence by, again, the semantic possible**
12 **difference between the words "defiance" and "combative."**
13 **One, Student had from 9/15 to February, the date of the**
14 **incident, Student had used his strategies with good success.**
15 **He used them -- I don't know a percentage, but if I were to**
16 **guess, 80 to 90 percent of the time utilized his strategies.**
17 **And his behaviors on that day at that moment were different**
18 **than anything we had ever seen from Student, ever seen. So**
19 **that just was not anything that had been manifested before.**
20 **It was out of the ordinary. It was unusual. So, again, a**
21 **disability typically does not -- you know, it's what they do**
22 **on a daily basis, it's what they do weekly. This was a very**
23 **isolated incident and extreme incident. Student's defiance**
24 **and his behaviors had not been aggressive, had not been**
25 **hurtful like they were on that day.**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 340

**Unusual behaviors perfectly coincide with adjustment disorder which is a manifestation of his disability.  Rob says its not what they do on a daily basis, it is what they do weekly.  This statement makes no sense whatsoever.  If a person is blind weekly, are they blind daily?**

6 Q Okay. You said Bobbiesue said "take a break"; is that true?
7 **A Yes. I'm not sure if it was the exact words, but "do you**
8 **want to go in your room," "do you want to talk to Mr.**
9 **Dorner," "do you want a fidget?" There's a fidget drawer**
10 **that Student would pull out his favorite things when**
11 **dysregulated and he was.**
12 Q What I'm looking for is the exact words that you heard come
13 out of her mouth.
14 **A No, I cannot say the exact words.**
15 Q So you don't recall the exact words she said?
16 **A Correct.**

**FINALLY THE TRUTH FROM ROB!**

19 Q Okay. So as they were -- when Student came in the office
20 and he was disruptive, right off the bat or immediately
21 about -- what did people -- how did people address his
22 behaviors or talk to him immediately when he came in and he
23 was acting out?
24 **A Yeah. I remember Ms. Adams stating, you know, "do you need**
25 **a break" or "do you want to go talk to Mr. Dorner," "do you**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 357
1 **want to go into your room," "do you need a fidget." And I**
2 **remember him saying, you know, don't care if he gets**
3 **suspended and I remember people saying "we don't want you**
4 **suspended, Student, just" -- I think Mr. Miller said "we**
5 **just want you back in class" and -- did I answer?**

**I THOUGHT FOR A SECOND ROB HAD TURNED OVER A NEW LEAF.   BUT HE**
**SLIDES BACK INTO MISINFORMATION OR UNTRUTHFUL INFORMATION.   HE**
**CLAIMS MR MILLER WAS PRESENT DURING THE INCENDENT, HOWEVER WHEN**
**MR MILLER TESTEFIED HE SAYS HE WAS NOT THERE.**

**Bobby Sue Adams Testemony**

**Student particularly struggled in the classroom**
24 **with those kinds of demands. Like he didn't want to do his**
25 **math, he didn't want to do his science. He did great in**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 368
1 **other areas, so if we weren't -- like he did better in**
2 **the -- some of the specials. He obviously did fine at**
3 **recess for the most part. So it was kind of those academic**
4 **demands is where we started to see Student struggle the**
5 **most.**

**Yes, I agree academically, but not behaviorally which is where**
**we saw him get suspended and expelled.   If fact of his last**
**three suspensions 2 occurred at recess and one in the halls not**
**in the classroom.  And they knew his tendency to find trouble was**
**outside the classroom.**

2 Q I don't know the order of things concerning MDR meetings.
3 Can you tell me if it's normal to have an MDR meeting before
4 or after a student has already served either some suspension
5 time or all of it?
6 **A The MDR from my understanding and I'm not -- this was my**
7 **first experience with it so I was learning with you. But**
8 **from my understanding, the MDR for the 504 comes at the 11th**

9 **day of suspension and then it goes the ten days after. So**
10 **he, the first MDR was -- is that in here (indicating)?**
16 Q Oh, okay. Would you agree that that's a lot of plans to
17 sort of memorize or keep straight in your head?
18 **A No. I don't memorize them. I have access to the paperwork.**

**So typically when we're looking at learning**
18 **disabilities, it might be like, you know, tests read,**
19 **shortened assignments, checks for understanding. So these**
20 **are -- these are -- these are best practices. These are**
21 **things I'm doing anyway. When you have a child with a**
22 **little bit more intensive plan, it's a little bit easier**
23 **almost to focus on that because -- you know what I mean? So**
24 **you're like, okay, these are the things that Student needs.**
25 **His breaks are scheduled in. And we try to make it as easy**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 386
1 **for teachers as possible.**

**IT READS HEAR AS IF IT IS STUFF TEACHERS ARE ALREADY DOING AND
THEY TRY TO MAKE IT EASY FOR THE TEACHER.  WHY?  SO THEY DON'T
EVEN HAVE TO REVIEW THE 504?**

16 Q Okay. Okay. Just wondered. All right. Can you give me a
17 definition of either of these diagnoses?
18 **A No**

4 **A Yes, if it were medical, but since the information came from**
5 **CMH, we used the information from the report from CMH.**
6 Q Did you use it?
7 **A Yes.**
8 Q Why -- why -- why isn't there a note that it -- I don't --
9 **A It's attached to his 504 in his CA-60.**
10 Q Oh, I wish I had that. Okay. All right. Exhibit P-3,
11 expulsion minutes. Actually, before I -- before I get to my
12 next question I'm going to expound on the last one which is
13 you claim you have this medical information. You say you
14 looked at it. Did you review it?
15 **A Yeah, I read the whole thing several times.**
16 Q Who else read that information?
17 **A Mr. Dorner.**

**THAT'S FUNNY WHEN I ASKED ROB ABOUT ADDITIONAL MEDICAL
INFORMATION HE KNEW NOTHING ABOUT IT.**

9 Q Okay. Do you feel qualified to make a determination
10 regarding whether or not the behaviors in question at the
11 MDR meetings were related to Student's disabilities?

12 **A No.**

13 Q But I signed a release and gave it to you giving you the
14 ability to do it if you wanted to?
15 **A Yes.**

**This is regarding the dhhs medical release information.**

21 Q -- that it was being released to? Okay. Personally to me I
22 don't understand what -- what the release is for then if it
23 doesn't have anybody listed that you have -- that you're
24 talking to. What was it for?
25 **A If I had needed -- like if you couldn't provide me that CMH**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 406
1 **paperwork, then I could have reached out to CMH and gtten**
2 **it but you gave it to me.**

**Here she finally admits she had the ability to get medical
information if she chose to.**

23 Q You mentioned earlier that you paid close attention to what
24 Rob had to say in regards to the situation because he's more
25 of the expert in the field. Did he advise you on --
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 408
1 **A No.**
2 Q Okay. Did he -- do you recall him advising you during the
3 meeting?
4 **A No.**

She says she relied on Rob to make her decision but she also
says that he did not advise her on her decision.  Confusing!

12 Q I've personally been to your office area at Kreeger many
13 times and heard a lot of talking, doors opening and closing,
14 crying children hurt at recess that come in and other
15 disturbances, two secretaries at the front answering phones,
16 typing, commotion, people coming in and out. Do you -- do
17 you believe that's a quiet place?
18 **A That morning it was. It was just Donna, Taunya and I, and**
19 **then Mr. Morehead dropped of Student.**

11 **A At that moment it was. We weren't getting phone calls. It**
12 **was just us. We were talking to him, he was talking to us.**
13 **If it started to get busy, we would have moved.**

**Notice she does not mention ROB DORNER IN THE OFFICE.
THAT WAS BECAUSE HE WAS NOT THERE.**

**Also, she admits to addressing concerns before he calms down.**

17 Q Yeah; yeah. P-18. Oh, that's -- that's also -- I mean,
18 they each have separate titles, so, but that's all part of
19 the intervention plan?
20 **A Yes. You had referred to earlier to how does the teacher**
21 **know what to do?**
22 Q Yeah.

She has them using an intervention plan that does differ from
the 504 I signed.

1 Q However, even though you said they did very well for -- with
2 it and they weren't overwhelmed, you're aware that Mr.
3 Morehead and Mr. Collins decided not to follow these plans
4 in Student's last semester with Kreeger?
5 **A We discussed that. We didn't want it to feel punitive when**
6 **he switched classrooms and so they wanted to give him a**
7 **fresh start and we agreed that a fresh start was reasonable.**
8 Q As a result Student did not have the escort in the hallway
9 as stated in the consequence plan and break schedule, and an
10 incident did occur on his last day in school in the hallway;
11 is that true?
12 **A He was leaving Mr. Morehead's class. Yup. So it would have**
13 **been in the hallway.**
14 Q So you agree that the break schedule was no longer followed,
15 he was supposed -- before, with the break schedule, he's
16 supposed to have a chaperone if he goes in the hallway; is
17 that true?
18 **A Yes.**
19 Q Okay.
20 **A He still should have asked to leave the classroom and he was**
21 **not doing that.**
22 Q Yeah. It says -- it says -- if you read the break schedule
23 it says -- it says, "Student is not allowed to leave the
24 room without a chaperone "
25 **A Right.**

12 Q To me when I look at it, it looks like it was created by his
13 teachers. Why is -- where is your name on this?
14 **A I get the document and I put in the accommodations because**
15 **each child has different accommodations. So my name**
16 **isn't -- isn't on it.**
17 Q What documents did you get from Morehead to put this
18 together?

19 **A I guess I don't know what you're asking.**
20 Q What documents did Mr. Morehead give you to put this
21 together? Because you're not in the class, he is.
22 **A Right. So then he would say he did preferential seating,**
23 **checks for understanding so then I check.**
24 24 Q But you didn't get anything in writing from him that said
25 "this is what I did today with Student"?

1 **A They were probably verbal conversations and then assessment**
2 **data when he would take tests down with us. That's --**
3 **that's from when we would give him assessments. And then**
4 **any time we -- because there were a lot of times in the**
5 **office that we would shorten his assignments, so those would**
6 **be things that we did.**

**Changing her story about the accommodation log.**

3 Q Okay. In Exhibit P-8, under "Identify," -- under -- it's --
4 I don't know. It's Form H. It says,
5 "Identify how this disability affects the major
6 life activity." "Student shuts down easily (sic) when
7 frustrated with having to do things he does not want to
8 do; this leads to defiant and combative behavior."
9 And if you want to go to the other one, it's kind
10 of similar to that, but it says,
11 "Student can become lethargic and/or feel
12 incapable of academic success due to negative
13 emotionality. His nervousness and irritability can
14 interfere with his (sic) focus and attention to
15 instruction, tasks and assignments."
16 I think the first 504 describes it best when it
17 says he shuts down easily when frustrated with having to do
18 things he doesn't want to do and it leads to defiant and
19 combative behavior. Which Rob testified that both are true,
20 both have relevance during his testimony. Do you think that
21 sounds a lot like the events that occurred on the day
22 that -- his last day in school?
23 **A I think that you keep focusing on this piece here and I**
24 **don't -- none of us disagree with how Student reacts.**
25 **Ultimately it's how he handles that situation when we're**

1 **talking to him. So, yes, he gets defiant, he does get**
2 **combative. But on the other side of that coin, when he**
3 **comes down and he's defiant or combative with us, that's**
4 **part of our protocol is talking to him, getting him to**
5 **understand that he doesn't need to be defiant, he doesn't**

6 **need to be combative, we can have a conversation. So, I**
7 **mean, yes, he does have a defiant and combative nature at**
8 **times but he's also someone you can have a conversation with**
9 **and he can come down and be, like, "okay, I shouldn't have**
10 **done this." So —**

**The only protocol is to follow the 504 in this situation and**
**they disregard it and do not put him in a quiet place to calm**
**down BEFORE addressing concerns.**

10 Q So would you agree that the events that took place on that
11 day meet these three words, he was frustrated? That's a
12 given. He became defiant, and at the end he was combative?
13 **A Yes.**
14 Q Okay. All right. Is that a "yes"?
15 **A It was a yes**

16 Q Okay. Hearing how Student's disability affects him as we
17 just read, as described in the 504, do you think that the
18 incident leading to his expulsion could be a manifestation
19 of his disability?
20 **A I went with "no" at the time, but I'm not an expert.**

9 Q And were you aware of any other medical or mental health
10 records from outside providers that existed?
11 **A J.C. had mentioned at one point that he saw a counselor I**
12 **believe when bio mom was still in the picture,**

**She was aware of other medical information.**

7 Q Okay. And do you feel like there was robust discussion at
8 that meeting about the incident and the relationship between
9 or the incident and Student's disabilities?
10 **A There -- I would say it was less robust than the first two.**
11 **The first two we really hit the meat and potatoes of all of**
12 **those questions. The third meeting it was definitely pared**
13 **down. Mr. Miller had said do we want to go over some of**
14 **this again and J.C. and people were like "no, it's the same**
15 **stuff" and so that one I think was a pared down version,**

20 Q When mentioning -- she asked you some difficult questions
21 such as I did in regards to how to determine whether or not
22 it's a manifestation of his disability. And one of the
23 things you kind of mentioned over and over about the last
24 day was that it was unique, it wasn't typical of Student,
25 and you alluded to so far this -- so this is -- this is part

Page 471
1 of my reasoning for determining that it wasn't part of his
2 disability; is that true?
3 **A Yes.**

This is a description of adjustment disorder behaviors out of
the ordinary.

5 Q I mean overall you mentioned no demands were put on Student
6 while he was in the office; is that correct?
7 **A I don't think I said no demands when he's in the office**
8 **ever. Like whenever we start decompressing there's no**
9 **demands on him because ultimately, like I said, we want to**
10 **get him back in the classroom. So if he walks down to the**
11 **office and we're, like, "do this, do this, do this, do**
12 **this," he's going to explode. So initially there's not**
13 **going to be demands on Student. Never. That's where we're**
14 **offering the food, we're offering the drink, "what do you**
15 **want to talk about? How are you feeling?" Like, initially**
16 **there's not going to be that demand when he's angry. Once**
17 **he calms down and you can have that conversation with him,**
18 **that's when we start to place the demands on him. Okay.**
19 **"Can you comply with this classroom expectation? Do you**
20 **think you could do, like, six problems of your math paper?"**
21 **So initially you can't put a demand on Student.**
22 Q I'm going to read your letter here. It says, "I asked
23 him" -- this is when he got to the office. This is P-1.
24 Again, back to your letter. It says, "I asked him" -- and
25 this is after he got to the office and you're starting off
Page 473
1 right off the rip he gets there.
2 "I asked him if he was going to comply" -- sounds
3 like a demand -- "with Mr. Morehead's requests" --
4 sounds like a demand -- "for the classroom. He removed
5 his hood but then he walked around the office upset
6 because he left for a few blank and all the blanking
7 rules changed. Donna Aldrich offered to show him (sic)
8 the information that was documented in the handbook."
9 Demand, come read the handbook, he didn't want to see
10 it. "He said he didn't care if he got suspended. I
11 explained that he knew we wanted him here but he had to
12 decide if he could follow the rules." Demand. "The
13 profanity and arguing continued as he complained about
14 the 'new' rules." Sounds like kind of a demand.
15 Now, I understand there's rules in life and he has
16 to learn to follow them. But when I read this right here,
17 it looks like there was demands put on him. Do you feel the

18 same?
19 **A If I had known I was going to spend this much of my time, I**
20 **would have done a way better job of verbatim copying down**
21 **that incident. In the moment it was, like, okay where -- I**
22 **mean that's a blurb out of a 20 to 30 minute. So, yes, we**
23 **started with the non-demands like usual. He started to come**
24 **down. That's when we started to talk about the hood. He**
25 **ramped back up after he took the hood off. There's that**

J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 474
1 **back and forth. But initially when he came down, there were**
2 **not demands placed on Student until he started to**
3 **de-escalate.**

MATTHEW LENZI Testemony

18 Q Okay. That's fine. That's fine. Can you describe how
19 these diagnoses affect Student?
20 **A I think there's no black and white answer with that. I**
21 **think that's a hard question to answer. I mean, but the**
22 **diagnoses affect -- I mean, they're -- they affect people.**
23 **I mean, they could affect his -- his behavior, his <u>thoughts</u>,**
24 **his <u>moods</u>, different things.**

25 Q So it's more than just behavior. There's -- there's

J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 482
1 thoughts that are affected, there's his moods, his emotions.
2 **A With PTSD you can have intrusive thoughts, you can have --**
3 **you could avoid certain things that remind you of the**
4 **trauma, your mood can be affected, I mean, a variety of**
5 **things.**

18 **A You might not visually see them. Someone is -- does have a**
19 **diagnosis. I mean, you don't necessarily know how someone's**
20 **feeling by just looking at someone.**
21 Q Right. Is there a good way to determine if a given behavior
22 of Student is related to one or more of his diagnoses?

21 Q Right. Is there a good way to determine if a given behavior
22 of Student is related to one or more of his diagnoses?
23 **A Kind of like I said, I don't think there's, like, a black**
24 **and white answer for that.**
25 Q Is there any answer?

J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 485
1 **A Well, I'm sure there's an answer, but I -- I -- I don't -- I**
2 **don't think it's black and white.**
3 Q So would you say that it's complex?

4 **A Yes.**
5 Q Okay.  Is there a good way to easily determine if Student's
6 behaviors are not related to his diagnoses? And I would
7 assume it's the same answer.
8 **A Same answer I would say.**
9 Q It's complex?
10 **A Yes.**

11 Q Okay. Are there times when Student's diagnoses are not
12 affecting him?
13 **A It's hard to say. I mean, but you -- you're -- when you**
14 **have a mental health diagnosis, it could affect you every**
15 **day. I mean, it can fluctuate. You can have moments when**
16 **you're doing better than others, so it can fluctuate.**

25 Q -- you mention to me that he's hyperactive, he won't
1 concentrate, he won't focus.
2 **A Yeah; yeah, he had very inattentive, difficulty engaging in**
3 **conversation, very impulsive, defiant, some swearing, hyper,**
4 **avoidant.**

1 Q Is it true that you attempted trauma therapy with Student?
2 **A Yes. We attempted to.**
3 Q But you had little success with the trauma therapy because
4 Student was avoiding and not engaging; is that true?
5 **A Correct.**
6 Q Is it true that trauma therapy can cause trauma responses
7 that may cause the patient to fully experience what caused
8 the PTSD to begin with?
9 **A It's not going to -- trauma therapy -- TF-CBT was the**
10 **therapy that I was doing with him. It's an evidence-based**
11 **practice. So it's backed up by research and I'm trained in**
12 **it. It doesn't re-traumatize a kid. A kid is not going to**
13 **go through the same trauma. Usually when someone is**
14 **traumati- -- or does have -- it could cause some increasing**
15 **in anxiety. I did very little trauma treatment with Student**
16 **because he just wouldn't comply and usually that would be**
17 **done in the narrative portion of TF-CBT, too. We were in**
18 **the psycho education piece which is the beginning of it.**
19 **And you usually in the trauma treatment, you use something**
20 **called gradual exposure which is how you introduce kids to**
21 **where they're able to kind of talk about it.**
22 Q Now you said it could cause anxiety?
23 **A It could for some people.**
24 Q Okay. Can this anxiety turn or cause a patient to exhibit
25 what most people would call bad behaviors or irritating

J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 488
1 behaviors?
2 **A I can't say one causes the other, but --**
3 Q Let me rephrase it. Can anxiety cause a patient to exhibit
4 what most people would call bad behaviors or irritating
5 behaviors?
6 **A Maybe in some kids.**
7 Q When did the trauma therapy start?
8 **A 2/7/22 I -- is when I would say it started.**

**The trauma therapy that caused anxiety coincides with the
behaviors that lead to James suspension and expulsion.**

9 Q Okay. Did this therapy happen during the time frame that
10 Student was -- oh, you may not know, but I'm going to --
11 I'm -- I'm just going to ask the question as I have it
12 written. Did this therapy happen during the time frame that
13 Student was suspended and expelled from school? And I wrote
14 notes in here that the bad behaviors and expulsion took
15 place from -- really the escalated ones took place from
16 January 1st, 2022 to March -- or is that -- no, that's
17 March, yes, March 8th, 2022. I believe the answer to that
18 is "yes" because you started in February of '22; is that
19 correct?
20 **A Yeah, we started February 7th.**

21 Q Okay. Did you talk with Student's school about the
22 treatments that you were involved in with him at all?
23 **A I talked with Rob Dorner.**

**Poof of the open door policy with CMH and their use and
knowledge of it. Also, their knowledge of James' ongoing
counseling Jason M and bobby Sue A claimed during their
testimony that he was not getting.**

23 Q Don't know. Okay. I have a consent to exchange medical
24 information from, dated from 3/20/21 on page, let's see, 2
25 of the form right here which I don't know if you have this.
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 490
1 Do you have this (indicating) with you? Probably not. This
2 is -- this is a release of information.
3 **A Okay. Yeah.**
4 Q And on the second page it has Kreeger as a school that you
5 guys can release information to.
6 **A Yes.**
7 Q Are you familiar with it?

8 **A I'm familiar with our releases, yes.**
9 Q Okay. Are you familiar with this release or no?
10 **A Well, it's -- (nodding head in affirmative).**
11 Q You are? Okay.
12 **A Yeah.**

17 Q And on the next page it's my signature's on it, --
18 **A Yes.**
19 Q -- which you're aware of that? Okay.
20 **A Yes.**
21 Q Okay. And this -- this -- this thing gives you guys
22 permission to share anything that the school wants to know
23 as far as the information that you have?
24 **A Correct, but some of them can be limited but I don't think**
25 **that one was.**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 491

**Proof of medical release.**

2 Q Okay. That's fine. What are the major traumas in Student's
3 life that have caused him to have PTSD?
4 **A Well, I know most of it occurred when he was living with his**
5 **bio mom. He would not get specific with me about it, so I**
6 **can't speak more really more than that.**
7 Q But you probably came across in the paperwork somewhere that
8 he's not seeing his mom?
9 **A Correct.**
10 Q And now you probably also know that I'm not his biological
11 father?
12 **A Correct.**
13 Q And so he has neither his biological mother or father in his
14 life.
15 **A Yes.**
16 Q Do you think this could contribute to some of the sadness
17 and difficulties that he's having in life?
18 **A I don't know because he didn't verbalize any of this, his**
19 **feelings to me.**
20 Q Do you think those feelings are so bottled up that he's
21 unwilling to?
22 **A Again, I don't know why he's not willing to, to share.**

**Back to Rob Dorner**

12 Q It seems, like, with drugs and stuff it would be something
13 where evidence should be needed because, I mean, people can
14 say anything about other people.
15 **A Absolutely.**

8 Q And the reason he -- one of the reasons he was upset and
9 frustrated was that he had felt as though he was wrongly
10 accused and suspended for the vape situation. Were you
11 aware that that was the reason he was in a mood?
12 **A I did not.**
13 Q Oh.
14 **A I was not.**

2 Q Okay. So it's possible to have forethought, plan it, do it,
3 know the outcomes, and still not necessarily maybe even be
4 in control of what you're doing?
5 **A That is possible.**

11 Q But and that, him clapping in the hallway, him not putting
12 his hood down, him cussing at people. He doesn't think he's
13 going to get caught in those situations? But yet he doesn't
14 want to get expelled, he doesn't want to be in trouble, and
15 yet he's doing these behaviors anyway. So I don't think the
16 him not getting caught part applies to most of the behaviors
17 that we see him doing, where he's intentionally
18 disrespectful, where he's cussing at people or he's getting
19 in fights or a majority -- I would say 90 percent of the
20 issues he's directly violating towards the staff.
21 **A Uh-huh (affirmative).**
22 Q Like, that's not him thinking he's not going to get caught.
23 That's him acting out and doing things that don't really
24 make rational sense to me. And I think maybe executive
25 function is one of the things that is -- I hear people say
1 "executive function" about children --
2 **A Uh-huh; yeah.**
3 Q -- in education settings. His -- he's -- his risk
4 assessment, right, like when you're -- that he doesn't have
5 it. Like he doesn't have the ability to assess the risk of
6 what's happening right now. Like I've told him, "you're
7 going to get expelled eventually." "Well, I don't want to
8 get expelled." "Well, if you keep getting suspensions,
9 you're going to be expelled." "Well, I don't want to do
10 that. I don't want to be in trouble." "Okay. Well, then
11 why do you keep cussing at teachers?" That's not him --
12 that's not him thinking he's going to get away with it.
13 That's him just doing things that don't make any sense when
14 you actually talk to him about what he wants in life and it
15 doesn't add up. And I've kind of been preaching out of my
16 mind which has limited knowledge in regards to the way
17 schools communicate and psychologists communicate and

18 psychiatrists communicate and therapists communicate, but
19 I know -- like, I know the truth, but I can't seem to put it
20 in words that will convey the reality I'm experiencing.
21 And -- and can you -- you see what I'm saying about --
22 **A I do, yeah.**

25 Q But you didn't have the 504 plan in front of you, did you?
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 514
1 **A Correct.**
2 Q Don't you agree that you should have had it?
3 **A That I should have had the 504?**
4 Q You should have had the 504 accommodation plan. You're
5 spending time with Student, you're responsible for enforcing
6 the 504 because you're a staff member, yet you don't have
7 the paperwork in front of you to be able to even know how to
8 handle the situation really.
9 **A Well, --**

PROOF ROB DID NOT HAVE ANY KNOWLEDGE OF JAMES 504 YET HE
TESTIFIED TO SEEING HIM DAILY WHILE JAMES HAD THE 504 IN THE
FALL OF 5TH GRADE.  ROB SUPERVISED AND HELP JAMES A LOT DURING
THAT TIME.  HOWEVER, HE HAD NO IDEA WHAT WAS EVEN IN HIS 504.
HOW IS ROB ABLE TO FOLLOW AN ACCOMMODATION PLAN THAT HE KNOWS
NOTHING ABOUT?

21 Q And then they say, you want to see it in the handbook?
22 We'll show you. It's right over here. Come take a look.
23 And then she says you got, you're going to have to follow
24 the rules. These things sound like -- kind of like demands.
25 You know, if you don't follow the rules, you're going home.
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 520
1 **A Yeah, I would agree with that. If Ms. -- if Ms. Adams**
2 **stated that she said -- I did not hear that.**
3 Q Here, it's in -- it's in -- it's in Exhibit 1, P-1, Exhibit
4 P-1 and it's her letter which is the fifth page in. And I
5 just read the second paragraph that came from her.
6 **A Yeah.**

**Again, Rob knows nothing about what is going on in the office
and he says he did not hear anything about the description of
the events that took place that day in the office.  Why?  He
claimed he was there even though Bobby Sue Adams did not recall
he was there during her testimony.  The obvious conclusion is he
was not there.**

18 Q The day that he came to the office, are you aware that

19 Bobbiesue stated that no one was in the office other than
20 her and Donna and --
21 **A I am not.**
22 Q -- what's her name, Rehfus, Taunya?
23 **A Yes.**
24 Q Are you aware that she stated that, that you weren't there?
25 **A I am not.**

9 **A As I stated before, I either entered the office or came out**
10 **of my office with the ruckus and "Student, do you want to**
11 **talk? Do you want to go to, you know, your room" and "no;**
12 **no; no." So I kind of backed off of what Bobbiesue was**
13 **doing, the administrator was doing with Student at that**
14 **time, so –**

**NOW HERE ROB CLAIMS HE CAME ON THE SEEN AFTER THE RUCKUS WITH
JAMES WAS ALREADY UNDERWAY.   THE QUITE ROOM TO CALM DOWN BEFORE
ADDRESSING CONCERNS DID NOT HAPPEN EVEN IF HE WAS EVER THERE.**

18 Q What if anything do you recall about the discussion?
19 **A Mostly what I recall is that is one of the questions of the**
20 **MDR, is was the 504 implemented? And I recall that every**
21 **school member and stepmom, K.H., sorry, said that it was**
22 **not -- believed that it was not a manifestation of his**
23 **disability in the first two -- February 14th, I believe --**
24 **and that all school personnel -- or, no, I'm sorry. That**
25 **was manifestation. No. Everybody including dad agreed that**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 527
1 **it was implemented in all three MDRs.**

**HERE ROB IS ALL OVER THE PLACE.   VERY DEREGULATED AND CONFUSING
TO ATTEMPT TO UNDERSTAND ROBS RESPONSE.**

8 Q Do you recall the team discussing that?
9 **A Just giving the rationale for why we don't believe that this**
10 **was a manifestation of his disability would include the**
11 **disorders, but that's what the manifestation is, is did --**
12 **the first question. I'm sorry. The second question is did**
13 **we follow. The first one is was this related to his**
14 **adjustment disorder and his posttraumatic stress disorder.**
15 **So everything we discussed would have related to that. Did**
16 **I answer that appropriately or are you --**

**AGAIN HERE ROB IS ALL OVER THE PLACE.   VERY DEREGULATED AND
CONFUSING TO ATTEMPT TO UNDERSTAND ROBS RESPONSE.**

5 Q The question he asked and I'm re-asking you, is did we

6 specifically talk about his PTSD and adjustment disorder and
7 not -- not in the broad sense of it being his disabilities
8 weren't related to this. Did we discuss his disabilities
9 together as a team? Do you recall that happening?
10 **A As stated earlier, my recollection is that you stated when**
11 **we asked whether it was a manifestation of his disability,**
12 **I'll try my best, but it was something like adjustment**
13 **disorder -- "he's diagnosed with adjustment disorder, so**
14 **anything bad he does is related to his adjustment disorder."**
15 **And that's my recollection of that.**

**THIS IS ROBS FULL RECOLLECTION OF THE IN-DEPTH CONVERSATION
REGARDING JAMES PTSD AND ADJUSTMENT DISORDER AT THE LAST MDR
HEARING.**

16 Q What I recall is you saying it was a result of his choices
17 and not related to his disabilities.
18 **A Correct.**
19 Q And that was the main conversation and point you were trying
20 to drive home. You remember that?
21 **A Absolutely.**

**ROB DID NOT WANT TO DISCUSS ANYTHING OTHER THAN IT WAS A RESULT
OF JAMES CHOICE.**

7 Q However, if we go to Form O in the mediation section of this
8 day, it says that, "Review and summarize relevant
9 information of student's file." It says parent waived his
10 right, so we didn't talk about it. And then on number three
11 it says, "Review and summarize relevant information in
12 student's Section 504." It says parent waived his right, so
13 we didn't talk about it. And then it says on number four,
14 "Review and summarize relevant teacher observations of
15 students (sic)," parent waived his right, so we didn't talk
16 about. So between this and what I remember, I don't think
17 we talked about it. But you're still claiming that we did?
18 **A Absolutely.**

**How is this even possible? It's not.**

**JASON MILLER TESTIMONY**

22 Q But it's kind of a unique situation. Have you ever put a
23 student in two different classrooms like that before?
24 **A Not to my knowledge. I have -- I've moved students, many a**
25 **students before in the middle of the year for sure. But I**

1 don't -- I couldn't speak to over the 19 years I've been a
2 principal if I've ever done it like that before. I don't
3 know. I don't re- -- I don't recollect.

**IF JASON UNDERSTOOD ADJUSTMENT DISORDER HE WOULD KNOW THAT THIS WAS A TERRIBLE IDEA TO PUT HIM IN TWO DIFFERENT CLASSROOMS AND HE DID IT WITHOUT CONSENT FROM ME.  WHY IF HE HAD NEVER PUT AN ELEMENTARY CHILD IN 2 DIFFERENT CLASSROOMS IN 19 OF BEING AN EDUCATOR WOULD HE START NOW, WITH JAMES?  BAFFLING TO SAY THE LEAST?  HE LACKED UNDERSTANDING AND DID NOT CONSULT ME AT ALL ON THIS DECISION.**

22 Q I don't know the order of things with MDR meetings. Can you
23 tell me if it's normal to have an Mdr meeting before or
24 after a student has served suspension days?
25 **A Well, what triggers the MDR is if a student has been**

1 **suspended for ten days and they have a 504 or an IEP. So**
2 **when that happens, you hold an MDR to find out, you know,**
3 **what's -- why is this not working? Why has this student**
4 **been suspended for ten days? You know, is -- is what the**
5 **school or what's going on in the classroom not working? Do**
6 **we need to change something? Do we need to review it? What**
7 **can we do? What can we do to help the situation?**
8 Q So in his first MDR meeting because I -- I was under the
9 impression that MDRs are to determine whether or not it's a
10 manifestation of his disability.
11 **A Right. Manifest- -- manifestation determination review.**

**IN THIS SECTION JASON NEVER MENTIONS THAT THE REASON THE MANIFESTATION DETERMINATION REVIEW IS TO DETERMINE IF THE BEHAVIOR IN QUESTION IS A MANIFESTATION OF JAMES DISABILITY.  HE TENDS TO STAY FIXATED ON THE BEHAVIOR AND HOW TO FIX THE PROBLEM, BUT NOT UNDERSTAND THE PROBLEM. HE MISSED THE BOAT AND IT ALREADY LEFT THE DOCK!  HE GOES ON TO PONDER IF HE EVEN NEEDS TO REVIEW IT!  DUMBFOUNDING!  CLEARLY, HE DOES NOT UNDERSTAND THE PURPOSE OF THE MDR NOR DOES HE UNDERSTAND THE LAW PERTAINING TO THE MDR.**

21 Q Do you think it's important to understand what and how a
22 child's mental health disabilities affect them if they're
23 your students?
24 **A Do I think it's important to understand that? Sure.**
25 Q What can you tell me about Student's medical mental health

1 diagnoses?

2 **A About Student's mental health diagnoses?**

3 Q Yeah.

4 **A I had no -- without looking at his 504 plan, I know that he**

5 **has PTSD is -- is one of the things he -- they said at CMH**

6 **that he has. I don't recollect the other one. I mean, I**

7 **don't memorize 504 plans. I don't write them for the**

8 **school. I -- we read them when they come, when they're**

9 **created and sign off that we've read them, but I can't -- I**

10 **don't retain all 30 or whatever 504 plans or IEPs that I**

11 **read in a -- in a year.**

12 Q Do you know -- can you -- could you give me a definition of

13 PTSD?

14 **A Posttraumatic stress disorder, usually it's an event that**

15 **happens in your life that causes you -- I don't know,**

16 **sometimes, like, if you're in the Army or something,**

17 **something like that. It happens in wartime. It causes you**

18 **stress and it's a -- could be -- could be a mental health**

19 **disease.**

20 Q Okay. Well, there was one other diagnosis. The one you

21 didn't get was adjustment disorder. Could you give me -- do

22 you know --

23 **A Well, the one -- the one I don't have memorized.**

24 Q Or you didn't have it memorized.

25 **A Yup.**

1 Q Can you give me a explanation of what that is or do you

2 have --

3 **A Say it again.**

4 Q It's called adjustment disorder.

5 **A (Shaking head negatively)**

6 Q Okay.

7 **A Don't have a definition of that.**

**JASON ADMITS HE HAS NO IDEA WHAT ADJUSTMENT DISORDER IS. IF HE WOULD HAVE HE WOULD HAVE NEVER PUT HIM IN TWO DIFFERENT CLASSROOMS IN HIS LAST SEMESTER. HE DID HAVE ACCESS TO MORE INFO IN JAMES SCHOOL FILE HOWEVER HE DID NOT EVER REVIEW IT BEFORE MAKING HIS DECISION TO PUT HIM IN TWO CLASSROOMS.**

16 Q Let me rephrase. I'm not necessarily looking for whether or

17 not he's being affected by his diagnoses. I'm asking you

18 what are the effects of his diagnoses? So how are they

19 affecting him? Can you -- do you -- do you have an idea of

20 how these diagnoses affect him?

21 **A Well, my guess would be that he would get stressed, you**

22 **know, being at times in the classroom and need, maybe, to**

23 **take a break or maybe need to reset.**

**HE TRULY DOES NOT UNDERSTAND HE HAS TO GUESS HOW THESE DIAGNOSES AFFECT HIM YET HE IS LEADING THE MDR MEETINGS TO DETERMINE IF A GIVEN BEHAVIOR IS A MANIFESTATION OF JAMES DISABILITY.   BLIND LEADING THE BLIND!**

24 Q Okay. Do you have any idea what triggers these diagnoses
25 that cause the flare-ups that -- that you witnessed and have
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 553
1 seen and heard about while he was with you at Kreeger?
2 **A Do I know what causes --**
3 Q The trigger. Like, do you know what triggers him to have --
4 **A Could be a -- could be a multitude of things. I don't know.**

**HE GOES ON TO STATE HE DOES NOT KNOW WHAT CAUSES HIS JAMES DIAGNOSES TO FLARE UP AS A BAD BEHAVIOR.**

2 Q I agree with you in that I do not want to give a license to
3 Student to misbehave because of some diagnoses.
4 **A I agree.**
5 Q However, I will say that to neglect the fact that these
6 diagnoses are real and impacting him daily is also not fair
7 to him. I don't know if you agree with that or not, but --
8 **A I don't -- well, I don't think we neglected it at all. I**
9 **mean, I really -- I -- I don't agree but I understand what**
10 **you're saying.**

**HE SAYS THAT HE DOES NOT NEGLECT IT BUT HE CAN'T EVEN ATTEMPT TO DESCRIBE, EXPLAIN OR DEFINE WHAT ADJUSTMENT DISORDER IS.   HE IS UNDOUBTEDLY IGNORANT OF JAMES CONDITIONS BECAUSE OF THAT HE AS A DEFAULT IS NEGLECTFUL ESPECIALLY CONSIDERING HE HAD THE ABILITY TO BECOME INFORMED.**

3 Q It says identify -- and this is from the latest 504 because
4 there's two of them. "Identify how this disability affects
5 the major life activities (sic)." It seemed like you were
6 alluding to that he's just lazy, he just doesn't want to do
7 the work, he's just -- he just won't cooperate. And yet the
8 504 kind of mentions some of that as part of his major life
9 activities that are affecting him. It reads --
10 **A What -- what --**
11 Q It's P- -- P-9, Form H. P-9, Form H. And it's the first
12 form of P-9.
13 **A Form H.**
14 Q It says -- it says Exhibit P-9 at the top.
15 **A Yup, I got it.**
16 Q It says,
17 "Student can become lethargic and/or feel

18 incapable of academic success due to negative
19 emotionality. His nervousness and irritability can
20 interfere with his (sic) focus and attention to
21 instruction, tasks and assignments."
22 I think what you just said was, you know, he
23 doesn't want to do the work. Well, what -- what I'm asking
24 you is how does it affect him? It's saying it affects him
25 by him not -- not -- you know, he's -- he's nervous, he's

Page 556
1 irritable, it interferes with his ability to focus and
2 attention to instruction, tasks and assignments. I think
3 what you just described was kind of what this reads as far
4 as his lack of cooperation in school, his apparent lazy
5 behavior of not wanting to cooperate. But they give you a
6 little bit of a clue as to why, what's going on in his head.
7 They tell you it's emotional, emotionality which is stemming
8 from this PTSD, and some other things. And if you read at
9 the -- read the part above where it says,
10 "Student's disability (sic) under Section 504
11 which affects the major life activity above (sic):"
12 The bottom line, it says, "Emotional controls and
13 adjustments; Sadness, decreased self-esteem, lack of
14 motivation, feeling of loneliness, excessive worry,
15 nervousness, feeling on-edge and irritability."
16 Now, I get a little emotional when I read that
17 because I care about him.
18 **A Sure.**
19 Q But I see these as root causes for what you're experiencing
20 and it's right in this 504 and I can see how it becomes
21 irritating when a kid won't cooperate, he won't comply, but
22 they're giving you little nuggets here of what these
23 diagnoses are doing to his thought process, doing to his
24 emotional state. I don't want to give him a license. I
25 want him to be successful.

Page 557
1 **A Right.**
2 Q I want him to have the help he needs to get there. I
3 recognize now -- and I don't want to testify right now, but
4 I recognize now that we have to help him in order for that
5 to happen.
6 **A For sure.**
7 Q Because he can't do it. And we have to take this
8 information into account when we're considering his
9 behaviors. So does the 504, when I read that, does that
10 help you understand how Student is being affected by his
11 diagnoses a little bit or no?

12 **A I understand what they're saying, sure.**

1 Q Well, up at the top it says "Team Signature." I thought
2 that meant team members, but I don't know the lingo.
3 **A Well, the team is the -- is the actual team that may --**
4 **writes the plan.**
5 Q Oh. So --
6 **A The signatures on here on this page, on this front page, --**
7 Q Uh-huh (affirmative).
8 **A -- on Exhibit P-9, --**
9 Q Yeah.
10 **A -- are that we've read and understand the plan.**
11 Q Okay.
12 **A So you're going to see special ed teachers, you're going to**
13 **see Ms. Aldrich, the building secretary, you're going to**
14 **see -- or I said special ed, specials teachers -- Lynly**
15 **DeLacy the music teacher, Katie Faucher PE teacher, Sandra**
16 **Gill science teacher, Crystal McCabe is the VLE teacher,**
17 **Kelly Chappell is our library aide. So all these people,**
18 **anyone that would have contact with the student, the 504**
19 **goes around through the building and they read it and they**
20 **sign the paper.**

**IF THIS IS TRUE WHY DID ROB DORNER NEVER SIGN IT, OR SEE IT?**
**Rob testified to JAMES being one of his top 5 most worked with**
**kids during the time that the 504 was in force. BUT NOT ONLY DID**
**HE NOT SIGN IT HE CLAIMED AT ONE POINT DURING HIS TESTIMONY HE**
**DID NOT EVEN KNOW THAT JAMES HAD A 504.   STRANGE.**

21 Q You know, you mention anybody that had contact with him. Is
22 it true that Student spent time with Rob Dorner? Rob -- Rob
23 Dorner?
24 **A Yeah, oh, yeah.**
25 Q And I would say he had significant contact with Rob Dorner,
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 562
1 wouldn't you? Seemed like Rob was one of the go-to guys for
2 him to calm him down.
3 **A Yeah. Rob helped out.**
4 Q However, for some reason Rob isn't a signature on here and
5 Student spent a lot of time with him. When I questioned Rob
6 about it, I said, "Rob, did you have the 504 plan?" He
7 said, "No, I didn't have it." Why didn't Rob have the 504
8 plan?

10 **A Yeah, he wasn't in on the writing of it or didn't read it,**
11 **but --**
12 Q It just makes it difficult because he's responsible for also

13 implementing because he's a staff member and it's not
14 possible for him to implement it if he doesn't know about
15 it. If he -- if he doesn't have it; right? I mean,
16 that's -- he can't implement something he doesn't have.

24 Q But he was spending time with him after he had it in the
25 fall semester. According to him, it was considerable and he
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 564
1 made a lot of nice things about Student that he was really
2 nice in his class -- or his classes with special ed kids.
3 He also commented that Student was on his top five in the
4 school which means that they see him a lot because he's, you
5 know, got a lot of issues.
6 **A He's in the office a lot, yeah.**

18 Q Okay. Do you feel qualified to make a determination
19 regarding whether or not the behavior in question at the MDR
20 meetings were related to Student's disabilities considering
21 you have no mental health experience or education?
22 **A Do I feel qualified in giving my opinion at an MDR meeting?**
23 **Is that what you're asking me?**
24 Q Yeah. And the second part is although you have no mental
25 health experience or education?
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 575
1 **A Well, I don't -- I don't have a mental health background,**
2 **but I -- yes, I do feel I'm qualified to give my opinion on**
3 **a student's behavior at an MDR meeting if that's what you're**
4 **asking me.**

**He is qualified to talk about James behaviors and how bad and**
**frequent they are, but, notice he did not say that he is**
**qualified to give his opinion in regards to whether or not they**
**are a manifestation of his disability.**

17 Q Okay. I'm going to move on. Where am I? Who's responsible
18 for implementing Student's 504 plan?
19 **A Well, the responsible party is the classroom teacher, but**
20 **the person that wrote and that manages it would be Ms.**
21 **Adams. So Ms. Adams oversees that the 504 is being followed**
22 **by the classroom teacher, but the classroom teachers are the**
23 **ones that implement whatever the plan is for the child.**
24 Q Are there other people that are responsible for implementing
25 it?
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 588
1 **A Every classroom teacher that he would go to. So a science**
2 **teacher, Ms. Gill, yes; social studies teacher, Ms. Johnson,**

3 **yeah, they're responsible for following the 504 plan.**
4 Q When I read it in P-8 or P-9 -- it doesn't matter where you
5 go -- some of -- some of the accommodations such as, like,
6 with behavior, it says "Disrespectful Behavior" or
7 "Emotional Behavior," it says staff which to me -- and also
8 in "Assessments," which, I don't know what it says in the
9 other one. I think it also says Assess- -- "Assessments."
10 It also says "Staff." So to me that means basically every
11 teacher/staff member in the building is responsible for
12 implementing it. Would you agree with that?
13 **A Yeah; yeah.**

THIS SEEMS TO BE A COMMON MISUNDERSTANDING BY MOST IF NOT ALL
KREEGER STAFF THAT TESTIFIED.   THE MISUNDERSTANDING IS WHO IS
RESPONSIBLE FOR ENFORCING THE 504.   MOST THINK THAT IS LIMITED
TO THOSE WHO SIGN THE 504 OR THE ONES WHO CREATED IT, WHEN IN
FACT, IT IS EVERY STAFF MEMBERS RESPONSIBILITY AT KREEGER
ELEMENTRY.

18 Q Okay. Did you ever hear me say at any time during any of
19 the MDR hearings that I waive my right to anything?
20 **A You didn't use the words "I waive my right." If you're**
21 **referring to the MDR where it's -- where I wrote on there**
22 **"waived right," we asked you I think in there because we had**
23 **just had the MDR a few weeks prior, that no new information**
24 **would be shared. So I just asked you is it okay if we move**
25 **on from this question and you were, like, "yeah, that's**
1 **fine." So my writing is "waive right," but you didn't say**
2 **"I waive my right to that question." It was the reason why**
3 **that it's written like that is because I said do you want us**
4 **to revamp or re-go over all the stuff that we just shared**
5 **with you, you know, a couple of weeks ago and you're, like, no,**
6 **because nothing had changed. So that's why that's written**
7 **like that.**

HERE JASON ADMITS THAT NO NEW INFORMATION WOULD BE SHARED.
WELL, WHAT ABOUT NEW INFORMATION IN REGARDS TO WHETHER OR NOT
THE INCIDENT IN QUESTION IS IN FACT A MANIFESTATION OF JAMES
DISABILITIES?

13 **A Does that make better sense than me thinking that you just**
14 **said "waived" -- you waived your right?**
15 Q I don't -- I don't necessarily recall and I'm speaking -- I
16 don't know how to phrase this in a question. I don't recall
17 permitting you to not discuss the issues related to

18 Student's behaviors and how they may related to his
19 disabilities and I wish we could have done that, especially
20 considering it was leading to an expulsion. I kind of felt
21 as if this was sort of pushed on me as opposed to me saying,
22 yeah, let's not talk about any of this stuff even though my
23 kid's going to be expelled. That was my take from it. I --
24 I don't know how to frame that into a question per se. I
25 felt as if -- and I don't know -- that you chose to waive or

J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 593

1 not discuss the information in the MDR meeting because we
2 had just had an MDR meeting and you said there was no need
3 to review it again. Do you remember saying there's no need
4 to review it again?
5 **A No. I remember asking you do you want to review this again?**
6 **We ju- -- there will be no new changes from what we stated a**
7 **few weeks ago. It's going to be the same information.**

**YES, THERE WAS NEW INFORMATION CONCERNING THE INCIDENT THAT THE
MDR HEARING WAS CONSIDERING. IN #4 RELEVANT TEACHER OBSERVATIONS
REGARDING THE INCIDENT IN QUESTION, #2 REVIEWS RELEVANT
INFORMATION IN STUDENTS' FILES CONCERNING THE INCIDENT. #3
REVIEW 504 INFORMATION IN REGARDS TO THE INCIDENT.  ALL COULD
HAVE BEEN REVIEWED IN REGARDS TO DETERMINING WHETHER OR NOT THE
INCIDENT IN QUESTION WAS INDEED A MANIFESTATION OF JAMES
DISABILITY.  THIS MAKES THIS CASE A WRAP!!!**

8 Q Why -- what -- okay. Why would there be no new changes when
9 it's a completely new MDR meeting? Is it because we don't
10 want to look at the evidence? He's -- he's not -- it's not
11 related to his disability so we're going to do the same
12 thing we did last time? Is that what you're saying?
13 **A No. It's -- it's more of like a history review of his**
14 **behavior or of what's going on. And we had just talked -- I**
15 **mean, he just had an MDR ten days -- ten school days prior**
16 **to that.**

11 Q Do you remember talking about specifically -- which I don't
12 think we did -- his disability, his PTSD or his adjustment
13 disorder in the last MDR meeting?
14 **A Specifically? Not in great detail that I remember, no.**

REMEMBER HE DOES NOT EVEN KNOW WHAT ADJUSTMENT DISORDER IS.

4 Q I don't recall receiving the procedural safeguards at that
5 meeting. Did you give them to me?
6 **A I believe Rob Dorner gave them to you or slid them to you.**
7 Q I asked him when he testified if he handed them to me and he

8 said "no." And then I asked him did you see someone hand
9 them to me, and he said, "no, I don't recall." So he didn't
10 give them to me nor did he see anybody give them to me.
11 MS. STARLIN: Is there a question?
12 Q The question is did you see anyone give them to me?
13 **A Not that I recollect.**

14 Q Okay. Because of the last MDR meeting we did not have
15 discussions regarding whether or not there was a
16 relationship between Student's behavior and disabilities
17 were we? Because I don't -- I don't remember lengthy
18 discussions. Primarily what I remember is Rob saying it was
19 his choices and then everybody going around the room and
20 having to put -- say whether or not it was related to either
21 his disability or -- and then also did the school follow the
22 504 accommodation plan. And everybody just kind of went
23 around and said, "no, it wasn't related to his disability"
24 and, "Yeah, the school, you know, followed the plan." Do
25 you remember lengthy discussions about anything during that
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 600
1 last MDR meeting?
2 **A I remember discussing the incident that happened --**

**JASON LIKES TO DISCUSS THE INTOLERABLE BEHAVIOR BUT HE HAS NO
INTEREST IN INVESTIGATING IF THE BEHAVIORS ARE A MANIFESTATION
OF JAMES DISABILITY BECAUSE THE BEHAVIOR IS INTOLERABLE.**

11 Q What input do you recall hearing from the members other than
12 them saying --
13 **A Oh, J.C., I have no -- I mean --**
14 Q Okay. Okay. Fine. Don't recall.
15 **A That's five months ago.**
16 Q But you do recall them saying, no, it wasn't related to his
17 disability?
18 **A I do recall them saying that, yes, and then that you**
19 **disagreed.**
20 Q Yeah.

JASON SAYS HE ACTUALLY CAN NOT RECALL WHAT INPUT OTHER MEMBERS
OF THE MEETING HAD!

10 Q Okay. Okay. Did anyone ever tell you that they put Student
11 in a quiet place before addressing concerns?
12 **A Did anyone tell me they put Student in a quiet place before**
13 **when?**
14 Q Addressing the concerns that he was presenting his
15 behaviors?

16 **A No one ever told me that, no.**

20 Q Okay. Can you prove that his disability did not play a
21 significant role in his behaviors on his last day with you
22 at Kreeger?
23 **A I can't prove it, no.**

11 Q Was he usually in school or was he a student who was absent
12 a lot?
13 **A No, he was in school. He did not miss school.**

**HE LIKED SCHOOL UNTIL HE BEGAN BEING UNLAWFULLY SEARCHED.  I
NEVER GAVE PERMISSION TO THE SCHOOL TO SEARCH HIS PERSON OR
BELONGINGS, BECAUSE I DID NOT ENROLL HIM AND I AM THE ONLY ONE
WHO HAS THE LEGAL AUTHORITY TO ENROLL HIM.  THIS IS THE POINT AT
WHICH IN JAMES TESTAMONY THAT HE CLAIMS HE LOST TRUST IN THE
STAFF AT KREEGER.**

23 Q At the last MDR meeting do you recall discussion about
24 Student knowing the difference between right and wrong?
25 **A I don't recall if we specifically talked about. I don't --**
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 632
1 **no, I don't really remember.**

JASON AGAIN CAN NOT RECALL.  I REMEMBER BILL CLINTON USING THIS
TACTIC AND JASON DOSE HAVE AN UNDERGRAD IN PRE LAW.

9 Q Did you look at the 504 plan when you were in the MDR
10 meeting?
11 **A During the meeting, no. I was running the questions and the
12 answers so I didn't have it in front of me.**

15 Q -- you see it -- do you see it as -- is it possible that you
16 could see it as I do, which is evidence that points to
17 extensive mental health problems?
18 **A No. I don't -- I don't see it in that regard. I see it as
19 more he gets more defiant, more, doesn't want to be --
20 doesn't want to have rules and regs. Just doesn't want
21 to --**
22 Q Your description, though, of what you're describing is
23 actually what's exactly written in the 504. He's defiant
24 and he won't cooperate. That's in the 504 and it's right
25 underneath the description of how it affects his major life
J.C. o/b/o J.C. v. FOWLERVILLE COMMUNITY SCHOOLS, HEARING VOLUME III July 18, 2022
Page 637
1 activity. So how do -- how do you separate that? How are
2 you able to say -- "I know it's the exact description of

3 what's written in the 504, but, no, I don't see it as being
4 related to his disability"?
5 **A Because the incidences like I stated before, were**
6 **choices where he's under no load of any pressure. He's out**
7 **at recess, he's -- he makes these choices that he knows are**
8 **not smart decisions.**

**JASON MAKES UP HIS OWN RULES AND PROTICALS TO DETERMINE JAMES
DISABILITY INVOLVEMENT INSTEAD OF USING THE AGREED TO 504.  SO
CONFUSING.**

19 Q When I tried to really pin down what you guys were doing to
20 determine whether or not it is related to his -- or a
21 manifestation of his disability, I hear all kinds of lingo.
22 All kinds of talk. You know, it wasn't his choices, he
23 wasn't impulsive, he wasn't under stress, he didn't --
24 wasn't being told -- he wasn't having demands put on him, he
25 wasn't this, wasn't that. But I think the simplest way and

1 the way that you should handle it in the future, is you just
2 go to the MDR description -- or not the MDR, the 504 -- the
3 504 description of what describes what his disability
4 affects in his major life activities and when you read that
5 description like I did, it falls right in line with what his
6 disability is. It seems like a really straightforward, easy
7 way to have a real easy way to determine whether or not it's
8 a manifestation of his disability. But what I hear is a
9 bunch of unqualified people that don't have mental heath
10 qualifications, don't have mental health education, don't
11 even -- haven't seen or reviewed his medical file, either
12 don't have his 504 accommodation plan making decisions about
13 his mental health and determining it has nothing to do with
14 his disability when they're not informed, they're not
15 educated, they're not capable to make the decision and
16 they're just shooting from the hip. I mean, do you feel
17 like you're shooting from the hip?
18 **A No. But that's why I urged you earlier when I talked to you**
19 **about if you have that medical documentation, just bring it**
20 **in. Bring it in. Make sure that the office has it, the**
21 **teacher has it instead of just saying "I signed off." Then**
22 **you're not going to be frustrated. You're going to, like,**
23 **"Hey, I brought this in. I brought the documentation in for**
24 **you. You got to read it." And when you sit down to do the**
25 **next 504, bring that in. Say this is, you know, here.**

1 **Here's everything that you will need.**

4 Q He says, "I shouldn't be sent home for cursing."
5 **A Yeah. I see that's his opinion, but --**
6 Q I'm not saying he shouldn't be sent home for cursing.
7 **A Yeah, I know.**
8 Q I'm saying if you think about Student's thought pattern
9 there, could you possibly see that he desires to actually
10 stay in school because he's making an argument for himself
11 to not be suspended?
12 **A I don't know about that one. I see what you're saying, but**
13 **I don't -- that's kind of a stretch to get my mind to go**
14 **there, that he wants to be in school and doesn't feel like**
15 **he should after he -- what he did.**

**JASON CAN NOT GET PASSED THE BAD BEHAVIOR TO LOOK DEEPER INTO
HIS MOTIVATING THOUGHTS OF JAMES ARGUING THAT HE DOES NOT WANT
TO BE SENT HOME.**

21 Q How many types of absences does Student have like that where
22 he just wouldn't go to school?
23 **A Oh, his -- he doesn't have many absences at all.**
24 Q He doesn't have many at all, does he?
25 **A No.**

1 Q Did you know that we really never had to prod or argue with
2 Student to get him to go to school?
3 **A No.**
4 Q Do you know that almost all of his absences, including all
5 75 suspensions of different types and different times and
6 different lengths, were the primary cause of almost all of
7 the days that he missed?
8 **A I believe that.**
9 Q Could that possibly indicate to you that he actually wants
10 to be in school?
11 **A I think he enjoys the social part of the school for sure.**
12 Q So the argument that he just wants to be home and he doesn't
13 want to go to school doesn't seem to hold much water to me.
14 Does it hold much water to you?
15 **A I don't know why he does those things. I don't know what**
16 **his end goal was. I don't know. Wish he hadn't have.**

22 Q When I questioned him in regards to his typing -- and maybe
23 you can answer this. Was Rob put in charge of taking notes
24 during the MDR meeting? The last MDR meeting? Was he put
25 in charge of taking notes during the last MDR meeting?

1 **A Not to my recollection.**

2 Q During Rob's testimony he said -- when I asked him about why
3 he was on the laptop most of the time, because he wasn't
4 contributing to the -- to the meeting, he told me, "Oh, I
5 was taking notes on the MDR." Were you aware that that's
6 what he claims he was doing?

TURNS OUT THE ONE RUNNING THE MEETING DID NOT PUT ROB IN CHARGE
OF TAKING NOTES AS ROB SAID HE WAS.  I THINK ROB WAS NOT TAKING
NOTES ON THE MEETING, HOWEVER, HE WAS ON HIS LAPTOP MOST OF THE
MEETING EVEN THOUGH JASON DOES NOT REMEMBER IT BECAUSE ROB
CONFIRMED IT DURING HIS TESTIMONY.

22 Q Okay. Go to -- go to P-11. Is this the document that you
23 recall reviewing or looking at?
24 (Witness reviews exhibit)
25 **A No, I can't say that it is or isn't.**

**MAYBE THAT'S BECAUSE HE NEVER LOOKED AT THE MEDICAL DOCUMENT.
ALTHOUGH THERE IS A MEDICAL DOCUMENT IN JAMES STUDENT FILE
BECAUSE I RECENTLY ACQUIRED IT AND YES THERE IS ONE IN THERE.**

14 Q Were you aware that Rob allowed Student to cuss in the
15 office or with him?
16 **A No.**

**Finally, I would say my testimony and James is a must-read to
get the complete picture of this case however by focusing on
what the staff members testified proved their incompetence and
lack of knowledge and care regarding James and his education
experience with them.  Hopefully, through this hearing,
Fowlerville Schools can improve regarding all of their
involvements with children with disabilities.  I also hope that
this can be used to help James in the future so that he may have
a better opportunity to have success in school and in his life.**

**Sincerely**

**Justin Clayton**

# Kreeger Elementary School
## Jason Miller, Principal
### 7677 Sharpe Road • Fowlerville, MI  48836

March 1, 2022

Mr. Justin Clayton
8598 Cass River Drive
Fowlerville, MI 48836

Dear Mr. Clayton,

This letter is a follow-up to the conversation I had with you on Monday, February 28, regarding your child, James Clayton, and the disciplinary action the school is taking, specifically related to disrespecting the learning environment and insubordination to school personnel.  Due to the seriousness of the offenses, James has been suspended for ten school days, February 23 – March 8.  Additionally, James will need to appear before the Board Discipline Committee for possible long-term suspension/expulsion, pending the results of this hearing.  The school will present the facts as they relate to the latest school infraction and make recommendations to the Board's Discipline Committee for possible further suspension or expulsion.

The School Board Hearing will take place on Tuesday, March 8th, at 6:30 p.m.  The board hearing will be held in the Central Office conference room.  Your rights and James's rights entitle you to this hearing, be represented by legal counsel at your cost, and present any witness or other evidence (as necessary).

If you need further information, please contact me at (517) 223-6340, and I will be glad to assist you.

Sincerely,

Jason Miller
Kreeger Elementary Principal

(517) 223-6006  •  FAX (517) 223-6388

# KREEGER ELEMENTARY SCHOOL

## Jason Miller, Principal

430 N. Hibbard · Fowlerville, MI 48836
Phone: (517) 223-6340 · FAX: (517) 223-6388

March 9, 2022

8598 Cass River Drive
Fowlerville, MI 48836

Re: Findings of the Board Discipline Hearing

Dear Mr. Clayton,

The Fowlerville Board of Education Discipline Committee conducted a disciplinary hearing on March 9, 2022, and approved a motion that your son, James Clayton, be expelled for 180 school days.  The board approved the opportunity for James to apply in August for reinstatement for the 2022-2023 school year.  You can contact Assistant Superintendent Tim Dowker in late July or August at (517) 223-6027 to request the reinstatement hearing.

Throughout his suspension, James is not to be on Fowlerville Community Schools grounds for any reason unless he has permission from the building administration prior to arrival.  If he is present at any time on the Fowlerville School grounds without prior permission, he may be prosecuted under the State of Michigan Criminal Trespass Statute and/or applicable ordinances.  Convictions under the State of Michigan Trespass Provisions are punishable by a $500.00 fine and/or 30 days in jail.  This notice designates any Fowlerville Village Police Department officer as an authorized agent on behalf of the Fowlerville Community School District to arrest James if he is on the Fowlerville School campus at any time until further notice by the Fowlerville Schools Administration.

As explained in the student handbook excerpt below, there is a process for appealing the disciplinary committee's ruling:

### *Suspension of More than Ten Days/Expulsion*
*A student recommended for a long-term suspension or expulsion is entitled to a formal hearing. Procedural guidelines have been developed to facilitate the hearing/appeal process. The following procedure guidelines will be in effect during the school year:*

1. *Written notice of charges against a student shall be supplied to the student and his parent or guardian. Included within this notice shall be a statement of the time and*



## FOWLERVILLE COMMUNITY SCHOOLS
7677 Sharpe Road, Suite A
Fowlerville, MI  48836

FORM D

### NOTIFICATION OF PARENT RIGHTS
### Section 504 of the Rehabilitation Act of 1973

**DISTRICT SECTION 504 COORDINATOR:**
**TIM DOWKER, ASSISTANT SUPERINTENDENT**
**7677 SHARPE RD., SUITE A, FOWLERVILLE, MI  48836**
**TELEPHONE (517) 223-6027**

The purpose of this notice is to inform parent and student of the rights granted to them under Section 504. The federal regulations that implement Section 504 are found at Title 34, Part 104 of the Code of Federal Regulations (CFR). They include the following rights:

1. Have the district advise you of your rights under federal law;
2. Have your child take part in, and receive benefits from public education programs without discrimination because of his/her disability;
3. Receive notice with respect to identification, evaluation, or placement of your child;
4. Have your child evaluated by the district prior to determining eligibility under Section 504;
5. To be notified prior to any action (be it a proposal or refusal) regarding the identification, evaluation, or placement of your child;
6. Have evaluation, educational, and plan of services decisions made based upon a variety of information sources, and by persons who know the student, the evaluation data, and placement options;
7. Have periodic review of your child's educational need for Section 504 plan of services;
8. Have your child receive a free appropriate public education. This includes the right to be educated with nondisabled students to the maximum extent appropriate. It also includes the right to have the school district make reasonable accommodations to allow your child an equal opportunity to participate in school and school-related activities;
9. Have your child educated in facilities and receive services comparable to those provided nondisabled students;
10. Have your child be given an equal opportunity to participate in nonacademic and extracurricular activities offered by the district;
11. Examine all relevant records relating to decisions regarding your child's identification, evaluation, educational program and placement and obtain copies of educational records at a reasonable cost unless the fee would effectively deny you access to the records;
12. Receive a response from the school district to reasonable requests for explanations and interpretations of your child's records;
13. File a local grievance with the District 504 Coordinator;
14. Request an impartial due process hearing related to decisions or actions regarding your child's identification, evaluation, educational program or placement. You and the student may take part in the hearing and have an attorney represent you at your own expense. The impartial Hearing Officer will be selected by the district;
15. Hearing requests must be made to the District Section 504 Coordinator.

Submit a complaint with the Office for Civil Rights.
**Office for Civil Rights**
**Cleveland**
**U.S. Department of Education**
**600 Superior Avenue East**
**Suite 750**
**Cleveland, OH 44114**



**FOWLERVILLE COMMUNITY SCHOOLS**
7677 Sharpe Road, Suite A
Fowlerville, MI  48836

FORM E

## SECTION 504 MEETING INVITATION

|  | Date: | |
|---|---|---|
| ☐Initial | Student: | |
| ☐Annual | Birthdate: | |

Dear Parents,

You are invited to attend a meeting for your child. The purpose for this meeting is:

☐To discuss a referral your child for possible Section 504 eligibility

☐To discuss evaluation results and make a determination regarding Section 504 eligibility

☐To initiate/update educational and instructional needs on a Section 504 Accommodation Plan

☐To discuss the possible need to reevaluate to determine continued eligibility

This meeting will be held

| At this location | |
|---|---|
| On this day | |
| At this time | |

The following team members have been invited to attend this meeting:

| Name | Title/Position |
|---|---|
| | |
| | |
| | |
| | |

If, for some reason, the time and place is unacceptable, please contact me as soon as possible and we will attempt to make other arrangements.

All diagnostic information and reports are available for you to review by contacting me at:

Thank you.

_____              _____
(Signature)                                                            (print name)

Copies to:      ☐ Parents      ☐ CA-60      ☐ Building 504 Coordinator      ☐ District 504 Coordinator



**FOWLERVILLE COMMUNITY SCHOOLS**
7677 Sharpe Road, Suite A
Fowlerville, MI  48836

**FORM H**

## SECTION 504 ACCOMMODATION PLAN

| | | | |
|---|---|---|---|
| Student Name: | James Clayton | Today's Date: | 1/12/2022 |
| Student Id #: | 20011838 | Date Of Birth: | 7/07/2010 |
| School: | Kreeger Elementary | Grade: | 5 |
| Initial Evaluation Date: | 9/15/2021 | Annual Review Date: | 1/12/2023 |

**Specific area(s) concern**:

Defiant and disruptive behaviors in the classroom. Apathy toward academics and education. Attention seeking behaviors that disrupt the learning environment.

**Summary of most recent evaluation information**:

According to CMH, James has been diagnosed with Adjustment Disorder and PTSD. Further evaluation regarding the current presence of a diagnosis of PTSD is warranted.

**Student is disabled under Section 504 which affects the major life activity of**:

Emotional controls and adjustment: Sadness, decreased self-esteem, lack of motivation, feeling of loneliness, excessive worry, nervousness, feeling on-edge, irritability.

**Identify how this disability affects the major life activity:**

James can become lethargic and/ or feel incapable of academic success due to negative emotionality. His nervousness and irritability can interfere with focus and attention to instruction, tasks and assignments.

☒ **Eligibility Determination (Form G) is attached, date** | 9/15/2021

☒ **Re-assessment/Review Date**: | 1/12/2023 | (must be completed)

**Team Signatures (Name / Title):**

| Building 504 Representative | Parent / Guardian |
|---|---|
| General Education Teacher | Other |
| Other | Other |
| Other | Other |
| Other | Other |
| Other | Other |
| Other | Other |



**FOWLERVILLE COMMUNITY SCHOOLS**
7677 Sharpe Road, Suite A
Fowlerville, MI 48836

**FORM H**

**Section 504 Plan\* for:** James Clayton    **Date:** 9/15/2021

The 504 Team has reviewed the files of this student and concludes that s/he meets the classification as a qualified handicapped individual under Section 504 of the Rehabilitation Act of 1973. In accordance with the Section 504 guidelines, the school has agreed to make reasonable accommodations and address the students individual needs by:

| Specific Area(s) of Concern: | Accommodation(s): | Responsible for Implementation: |
|---|---|---|
| Frustration | Student may need breaks to help with emotional controls and nervousness. Student may need to see a trusted adult to process his sadness or worry. Breaks should keep under ten minutes to avoid lost instructional time and cannot be used repeatedly to avoid classwork. Student may ask for a break or teacher may suggest it. Student may need a quiet place in the classroom to resolve emotions on his own. Student may benefit from running errands or doing small jobs to help with relationships, motivation and self-esteem. | Teacher & Student |
| Seating | Student may need preferential seating near instruction and away from distractions to help emotional controls. Student may also benefit from sitting near a friendly peer to help stay on task, improve relationships and assist with self-esteem. | Teacher |
| Emotional Behavior | Student may need reminders to help when he becomes emotional. He may also benefit from a quiet place to calm down before addressing the concerns. | Teacher & Staff |
| Attention & Focus | Student may need frequent reminders to be on task and frequent check ins for understanding. Student may have lessened assignments when mastery is shown. Student may need extended time when working. | Teacher & Student |
| Assessments | Student may need extended time when working and an alternate environment for classroom and standardized assessments to help with motivation and self-esteem. | Staff |
| Follow up | Family will continue to use follow up care. Family will update the school on any changes and progress of care. Family will provide additional academic support at home, go over his papers at home, and return any papers that need fixing. | Family |

*\*A copy of this page must be provided to all individuals responsible for implementing it.*

**Section 504 Accommodation Plan Commitment**

☒ The District will implement the recommended plan.  Date of implementation: 9/15/2021

**Parent/Guardian Statements**

☐  I received written notice of my rights under Section 504.
☐  I received notice of the Section 504 evaluation and accommodation plan meeting.
☐  I agree with the Section 504 Accommodation Plan as written.
☐  I understand that if I disagree with the content of this Accommodation Plan, I have the right to ask for a Section 504 review meeting by filing a written request with the building 504 coordinator.

**Livingston Educational Service Agency**

<u>SECTION 504 – MANIFESTATION DETERMINATION REVIEW</u>  **FORM O**

Date of Review: ~~mm dd yy~~ 3|11|22  Date of Current Section 504 Plan: mr 9|15|2021

## STUDENT INFORMATION

Student Name: James Clayton  Date of Birth: 7/7/2010

School Building Attending: Kreeger Elementary Grade: 5

Parent/Guardian Name: Justin Clayton

Address: 8598 Cass River Drive Fowlerville, MI 48836

Phone: 248-444-2582  Email: jtcbox2002@yahoo.com

## PARENT CONTACT

Method of Contact: <u>Phone, Email, Letter, etc.</u> Phone + inperson
Contacted By: <u>Name of Person Contacting Parent</u> Jason Miller
Date Contacted: <u>Date Parent Contacted</u> 2/25/21

## MEETING PARTICIPANTS

_____  _____
Parent/Guardian  Administrator/Designee
_____  David Moreland
Parent/Guardian  Teacher/Service Provider
_____  _____
Student (when appropriate)  Additional School Staff
_____  _____
Other  Keri Miller, T.C.
_____  _____
Other  Other

✶ **CURRENT DRUG OR ALCOHOL USE**

1. Does the student currently engage in the illegal use of drugs or alcohol? Yes ✓ No _____

2. Is the student being disciplined for the possession or use of illegal drugs or alcohol?
   Yes _____ No ✓

If the answer to both questions is yes, the student is not entitled to a manifestation determination review and the student may be disciplined to the same extent that such disciplinary action is taken against students without disabilities.

**Livingston Educational Service Agency**

## SECTION 504 – MANIFESTATION DETERMINATION
### MEETING NOTICE AND INVITATION

**FORM N**

Student Name: James Clayton     Date of Birth: ~~mm/dd/yyyy~~ 7/7/10

School Building Attending: Kreeger Elementary Grade: 5

Dear Parent/Guardian Name(s)   Mr. Clayton

    You are invited to attend a Section 504 manifestation determination meeting to review whether your child's misconduct was a manifestation of his/her disability.

    The meeting will be held on:   Meeting Date   3/1/22
                          Meeting Time   8:00 A.M.
           at:   Meeting Location   Conference Room

The School District has invited the following persons to attend the meeting:

| NAME | POSITION/TITLE | NAME | POSITION/TITLE |
|---|---|---|---|
| Mr. Miller | Principal | Justin Clayton | father |
| Mrs. Adams | Vice Principal | Kasandra Henderson | |
| Mr. Dorner | Social Work | | |
| Mr. Morehead | teacher | | |
| Mrs. Miller | Teacher Consultant | | |

    You are encouraged to attend this meeting and participate in the decision-making process. If the meeting date or time is not convenient for you, please contact me at your earliest convenience and we will attempt to make other arrangements.

    Please contact me if you have any questions.

                            Sincerely,

                            504 Coordinator Name
                            504 Coordinator Title

Enclosure

---

PLEASE RETURN THIS PORTION OF THE FORM IN THE ENCLOSED ENVELOPE

✓   I will attend the Manifestation Determination meeting.
___   I am not able to attend and request the meeting be rescheduled.
___   I am not able to attend, but request that the meeting be held without me and that the paperwork be sent to my home address.

James Clayton         Justin Clayton
Student's Name (Print)         Parent/Guardian's Name (Print)

## Livingston Educational Service Agency

**FORM O**

**CONSIDERATIONS FOR REVIEW** - In carrying out a manifestation determination review, the 504 Team shall:

1.  Describe the behavior or incident that is subject to discipline.

Morehead - Found James outside classroom for 4th time clapping and being defiant. Brought to office swearing, more defiance. directly swore @ Mrs. Adams and gave her middle finger. James said, "Fuck you bitch." Tried to slam door. Gave her the middle finger.

2.  Review and summarize relevant information in student's file.

Parents waived because of previous MDR last week dated 2/14/22

3.  Review and summarize relevant information in student's Section 504 plan.

Parents waived because of previous MDR last week. PREVIOUS MDR 2/14/22

4.  Review and summarize relevant teacher observations of the student.

Parents waived because of previous MDR last week. dated 2/14/22

5.  Review and summarize relevant information provided by the parent.

Parents agreed w/ school summary. See the same things at home. They are working on various things to help James be more successful.

## MANIFESTATION DETERMINATION

*Father disagrees*

In relation to the behavior subject to discipline (see previous page):

1.  Was the conduct in question caused by or did it have a direct and substantial relationship to the student's disability?  Yes _____  No ✓

2.  Was the conduct a direct result of the School District's failure to implement the Section 504 plan? Yes _____  No ✓

If the Section 504 team answers "Yes" to either of the questions above, then the behavior must be considered a manifestation of the student's disability.

**Livingston Educational Service Agency**

**FORM O**

The Section 504 team's determination is that the behavior subject to discipline: (Check one)

☑ Is not a manifestation of the student's disability (school personnel may apply relevant disciplinary procedures applicable to all students)

☐ Is a manifestation of the student's disability

Date: ~~03/01/2022~~ mm/dd/yyyy

_____
Signature of Section 504 Coordinator/Designee

**PARENT/GUARDIAN SIGNATURE**

☑ I have received the Notice of Procedural Safeguards under Section 504.

☐ I agree with the determination above.

☑ I disagree with the determination above and understand that I have the right to request an impartial due process hearing by filing a written request for a hearing with the Section 504 Coordinator.

Date: 3-1-2022

_____
Signature of Parent/Guardian